# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UHS OF DELAWARE, INC.,** | : | **CIVIL ACTION NO. 1:12-CV-485** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED HEALTH SERVICES,** | : | |
| **INC.,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court in the above-captioned trademark dispute is a well-aged motion (Doc. 23) to dismiss filed collectively by defendants United Health Services, Inc., ("UHSI"), United Health Services Hospitals, Inc., ("UHSHI"), Twin Tier Home Health, Inc., ("TTHH"), Ideal Senior Living Center, Inc., ("ISLC"), Ideal Senior Living Center Housing Corporation, ("ISLCHC"), Delaware Valley Hospital, Inc., ("DVH"), and United Medical Associates ("UMA").[1]  Together with defendant Professional Home Care, Inc., ("PHCI"), defendants comprise an organized health care system providing a continuum of health care services.  All defendants except PHCI moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) in July of 2012, asserting that they maintain no contacts with Pennsylvania and are

---

[1] Defendant United Health Services Foundation, Inc. ("UHSFI") joined in the initial Rule 12(b)(2) motion but was voluntarily dismissed by plaintiff on October 6, 2014.  (See Doc. 90).

thus beyond the court's jurisdictional ken.[2]  For the reasons that follow, the court will deny defendants' Rule 12(b)(2) motion.

## I.  **Procedural History**

Plaintiff UHS of Delaware, Inc., ("plaintiff"), instituted this action on March 16, 2012, (see Doc. 1), subsequently filing an amended complaint (Doc. 9) on April 26, 2012, and a second amended complaint (Doc. 14-3) on June 6, 2012.  Plaintiff alleges trademark infringement and unfair competition under state and federal statutes, and asserts, *inter alia*, that defendants' recent rebranding initiative infringed upon trademarks that plaintiff owns.  Of the nine defendants named in the complaint, all but PHCI filed a motion (Doc. 23) to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  PHCI separately moved to dismiss (Doc. 24) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  The court denied PHCI's Rule 12(b)(6) motion, finding plausible merit in plaintiff's infringement claims.  (See Doc. 59).

On March 26, 2013, the court issued a memorandum and order (Doc. 58), resolving in part the Rule 12(b)(2) defendants' arguments.  Specifically, the court concluded that it possesses neither specific nor general jurisdiction over defendants in the usual form.  (See Doc. 58 at 11-34).  However, the court deferred ruling on an alter ego basis for jurisdiction pending jurisdictional discovery.  (See id.)  With discovery now closed and supplemental briefing concluded, (see Docs. 92, 99, 102, 105), the matter is ripe for review.

---

[2] PHCI conceded personal jurisdiction but challenged the merits of plaintiff's claims in a Rule 12(b)(6) motion ruled upon separately by the court.  (See Doc. 59).

## II.    **Factual Background**

Defendants are nine corporations headquartered in the southern tier of New York.  Together, they comprise an "integrated health care delivery system" that provides a wide range of health care services to the public.  (Doc. 99 at 1).  All Rule 12(b)(2) defendants are incorporated and have their headquarters in New York state, and none maintain offices, file taxes, keep bank accounts, or are licensed or incorporated in Pennsylvania.  (See Doc. 58 at 3-4).  Non-moving defendant PHCI, by contrast, is headquartered, licensed, and operates exclusively in Pennsylvania.  (See id. at 4).  As noted, the court has already determined that PHCI maintains contacts sufficient to support both general and specific jurisdiction in the forum.  (See id. at 16-18).  Significantly, it is PHCI's contacts with the Commonwealth of Pennsylvania upon which plaintiff relies to support its alter ego theory of personal jurisdiction, tasking the court to examine the relationship between the moving defendants and PHCI.

Defendant UHSI readily admits to being the parent corporation and sole member of defendants UHSHI, DVH, TTHH, ISLC, ISLCHC, and PHCI.  (See Doc. 28 at 4-8 (outlining ownership)).  It stresses, however, that defendant UMA is a professional corporation owned solely by New York-licensed physicians.  (See Doc. 28 at 8 (outlining UMA licensed shareholder structure)).  Although UMA is not a *subsidiary* of UHSI, the record demonstrates that it is nonetheless an *affiliate* of, and active participant within, the UHS system.  (See, e.g., Pl.'s Ex. A at 4, ECF No. 92-1 at 4 (UHSI document including UMA management in "UHS Entity/Top

Management Positions" chart); Pl.'s Ex. B, ECF No. 92-2 (same, in "Composition of Corporate/Subsidiary Boards" chart)).

Since 2007, Matthew J. Salanger has served as president and chief executive officer of both UHSI and UHSHI. (See Pl.'s Ex. A at 1, ECF No. 92-1 at 1)). His senior management team consists of the following individuals: John Carrigg, senior vice president and chief operating officer; Robert Gomulka, senior vice president and chief financial officer; Rajesh Davé, MD, executive vice president of clinical integration and chief medical officer; Joseph Cerra, senior vice president of home care, long term care, and physician practices; Robin Kinslow-Evans, vice president of strategic planning; Christina Boyd, vice president of community relations; E. Kay Boland, vice president of patient care services and chief nursing officer; and Jeffery Alexander, vice president and general counsel.[3] (See id.) Carrigg, Gomulka, Davé, Cerra, and Boland reprise identical leadership roles within UHSHI. (Id. at 1-2). Salanger or his designee represents UHSI and UHSHI on each subsidiary and affiliate board of directors. (See Pl.'s Ex. B, ECF No. 92-2).

Following a 2008 marketing and rebranding initiative undertaken at Boyd's suggestion, the UHS system began advertising itself to the public as an allied and uniform brand. Indeed, it is the unified image accomplished by this initiative that triggered the infringement claims presently before the court. As noted in detail infra, each entity's name now includes the UHS title followed by a specific location

---

[3] According to defendants' "Top Management" chart, Cerra's title changed in 2012 to eliminate the long term care element, and Kinslow-Evans's title changed in 2013 to include privacy officer responsibilities. (See Pl.'s Ex. A at 1, ECF No. 92-1 at 1). In 2012, Jeffrey Alexander replaced Donald Carlin as general counsel. (Id.)

or services delimiter.  (See Pl.'s Ex. 105 at 5-6, ECF No. 92-7 at 121-22; see also UHSI 30(b)(6) Dep. III (Boyd) 53:21-56:3, Sept. 12, 2014, ECF No. 92-6 at 254-57 (herein "UHSI Dep. III") (noting nomenclature changes for entire system to include UHS in all entity names)).  For example, DVH was renamed UHS Delaware Valley Hospital, ISLC and ISLCHC were renamed UHS Senior Living at Ideal, and PHCI and TTHH merged and were renamed UHS Home Living.  (See UHSI Dep. III 53:21-56:3, ECF No. 92-6 at 254-57; Pl.'s Ex. 100 at 1-2, ECF No. 92-7 at 115-16).  Defendant UMA was also renamed UHS Medical Group.  (See UHSI Dep. III 53:21-56:3, ECF No. 92-6 at 254-57; Pl.'s Ex. 100 at 1-2, ECF No. 92-7 at 115-16).

The initiative was cultivated and implemented by a centralized steering committee, Integration, Too!, that Salanger established shortly after assuming the roles of president and chief executive officer for both UHSI and UHSHI.  (See UHSI Dep. III 32:17-33:15, ECF No. 92-6 at 242-43).  Committee membership includes various UHSI and UHSHI senior executives in addition to business unit leaders and the heads of each system subsidiary.  (See Pl.'s Ex. 49 at 2, ECF No. 92-7 at 78).  It is this centralized steering committee and the fact that defendants intentionally hold themselves out as a unified corporate organization that fuel plaintiff's alter ego arguments.  The court examines the balance of the record evidence with respect to those managerial relationships and defendants' corporate image in detail *infra*.

## III.   **Standard of Review**

A federal court may assert jurisdiction over a nonresident of the forum state to the extent authorized by the law of the forum.  See FED. R. CIV. P. 4(k)(2).  The Pennsylvania Long-Arm Statute grants jurisdiction coextensive with that permitted

by the Due Process Clause of the Fourteenth Amendment, see 42 PA. CONS. STAT. §

5322(b), which in turn requires that nonresident defendants "have certain minimum

contacts with [the forum state] such that maintenance of the suit does not offend

'traditional notions of fair play and substantial justice." International Shoe Co. v.

Washington, 326 U.S. 310, 316 (1945).[4] Courts must possess either specific or

general personal jurisdiction over each defendant to comport with these principles.

See D'Jamoos *ex rel.* Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102

(3d Cir. 2009). The court has already held that it does not possess specific

jurisdiction over defendants, but has reserved ruling on the question of general

---

[4] The court would be remiss if it did not acknowledge the Supreme Court's
decision in Daimler AG v. Bauman, ___ U.S. ___, 134 S. Ct. 746 (2014), wherein the
Court recalibrated the breadth of International Shoe. See, *e.g.*, *In re* Asbestos
Prods. Liab. Litig., No. MDL 875, 2014 WL 5394310, at *3 (E.D. Pa. Oct. 23, 2014)
(citing Daimler and noting that the Supreme Court "has substantially curtailed the
application of general jurisdiction over corporate defendants"); see also Best Odds
Corp. v. iBus Media Ltd., No. 2:13-CV-2008, 2014 WL 2527145, at *1 (D. Nev. June 4,
2014) ("The Supreme Court recently clarified that the reach of general jurisdiction
is narrower than had been supposed in the lower courts for many years."). Without
minimizing its import, the court finds Daimler to be inapposite to the matter *sub
judice*. The Supreme Court did "not pass judgment on invocation of agency theory
in the context of general jurisdiction;" nonetheless, it noted that the agency
principles employed by the Ninth Circuit represent "a less rigorous test" than the
stringent alter ego approaches developed by several Circuit Courts of Appeals. See
Daimler, 134 S. Ct. at 769 (observing that "several Courts of Appeals have held . . .
that a subsidiary's jurisdictional contacts can be imputed to is parent only when the
former is so dominated by the latter as to be its alter ego"); see also *In re* Chinese
Manufactured Drywall, 753 F.3d 521, 530-31 & n.7 (5th Cir. 2014) (in post-Daimler
context, noting importance of the distinction between the Ninth Circuit's relaxed
agency test and the control-based alter ego inquiry adopted by various Circuit
Courts of Appeals). Moreover, the Court concluded that the subsidiary's in-state
contacts were insufficient—regardless of an agency relationship with foreign parent
Daimler—to maintain general jurisdiction over *either* entity. See id. at 758-62. This
court by contrast has already concluded that PHCI's contacts with the forum state
are sufficient to confer personal jurisdiction. (See Doc. 58 at 16-18).

6

jurisdiction, specifically alter ego jurisdiction, pending a period of discovery and supplemental argument.

A plaintiff may rely upon an alter ego theory of jurisdiction to bring foreign parents or subsidiaries within the court's jurisdictional reach "based upon their relationship with an in-forum entity." *In re* Chocolate Confectionary Antitrust Litig., 674 F. Supp. 2d 580, at 598-99 (M.D. Pa. 2009) (herein "*In re* Chocolate II") (citing Simeone *ex rel.* Estate of Albert Francis Simeone v. Bombardier-Rotax GMBH, 360 F. Supp. 2d 665, 675 (M.D. Pa. 2009)). The truest manifestations of an alter ego relationship are invasive control by a parent corporation over a subsidiary and disregard for traditional corporate boundaries. See 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 108.42 (3d ed. 2012) ("Only when the parent corporation has sufficient control over the subsidiary, or when the appearance of separateness is actually a sham, may contacts of one be imputed to the other."). This control must exceed the usual supervision that a parent exercises over a subsidiary. See, e.g., Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 300-01 (3d Cir. 2008) (concluding that ownership alone is not enough to exercise jurisdiction over a non-resident parent); see also *In re* Chocolate II, 674 F. Supp. 2d at 598 (citing Simeone, 360 F. Supp. 2d at 675). In other words, a foreign parent's control must exceed the boundaries of a traditional parent-subsidiary relationship, extending beyond mere performance monitoring, supervision, or announcement of general policies and procedures. See *In re* Latex Gloves Prods. Liab. Litig., No. MDL 1148, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001) (quoting United States v. Bestfoods, 524 U.S. 51, 72 (1998)).

This court has identified the following ten factors as indicative of corporate dependence:

(1)    the parent corporation owns all or a significant majority of the subsidiary's stock;

(2)    commonality of officers or directors exists between the two corporations;

(3)    the group possesses a unified marketing image, including common branding;

(4)    insignias, trademarks, and logos are uniform across corporate boundaries;

(5)    group members share employees;

(6)    the parent has integrated its sales and distribution systems with those of its subsidiaries;

(7)    the corporations exchange or share managerial or supervisory personnel;

(8)    the subsidiary performs business functions that would ordinarily be handled by the parent corporation;

(9)    the parent uses the subsidiary as a marketing division or as an exclusive distributor; and

(10)    the parent exercises direct control or provides instruction to the subsidiary's officers and directors.

*In re* Chocolate II, 674 F. Supp. 2d at 598 (citing *In re* Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 569 (M.D. Pa. 2009) (herein "*In re* Chocolate I"); Simeone, 360 F. Supp. 2d at 675. Applying these factors, the court should examine "the legal interrelationship of the entities, the authority to control and the actual exercise of control, the administrative chains of command and organizational structure, the performance of functions, and the public's perception" to determine whether the in-forum entity's contacts may be attributed to out-of-forum parents, subsidiaries, or affiliates. See *In re* Latex Gloves, 2001 WL 964105, at *3. No single factor is determinative, and the court may consider any evidence bearing on the existence of an alter ego relationship. See id. (explaining that analysis "should not be limited to traditional alter ego jurisprudence but should encompass whether or

8

not there is a single functional and organic entity") (citing <u>Doe v. Unocal Corp.</u>, 248 F.3d 915, 925-26 (9th Cir. 2001); <u>El-Fadl v. Ctrl. Bank of Jordan</u>, 75 F.3d 668, 675-76 (D.C. Cir. 1996)).

## IV.  <u>Discussion</u>

As this and many other courts have noted, the hallmark of an alter ego relationship is control that transcends the traditional bounds of a parent-subsidiary relationship.  <u>See</u>, <u>e.g.</u>, <u>In re</u> Chocolate II, 674 F. Supp. 2d at 598 (explaining that "[m]ore intrusive control" than that which marks typical corporate relationships is required); <u>Simeone</u>, 360 F. Supp. 2d at 675 (observing that "a plaintiff must prove that the parent controls the day-to-day operations . . . such that the subsidiary can be said to be a mere department of the parent"); <u>In re</u> Latex Gloves, 2001 WL 964105, at *3 (court should determine whether the parent corporation "exercise[s] an unusually high degree of control over the subsidiary").  Plaintiff contends that parents UHSI and UHSHI, together with their subsidiaries and affiliates, "maintain separate corporate structures on paper but not in practice" and that operational control of the entire system is vested not with the operating entities but instead with senior management of UHSI and UHSHI.  (<u>See</u> Doc. 92 at 3).  Plaintiff directs the court to a number of facts which it believes demonstrate a pervasive disregard for corporate boundaries among the collective defendants.  Ultimately, the case for alter ego jurisdiction rises or falls on a discrete inquiry: whether UHSI, UHSHI, or any other New York-based entity exercises such invasive control over the daily operations of Pennsylvania-based PHCI as to justify the court's exercise of personal jurisdiction, separately, over each.  This analysis requires an assessment of the

9

parent corporations' contacts with each subsidiary defendant, as well as an examination of those entities' respective connections to PHCI.

### A. The **Chocolate II** Factors

Plaintiff's opening brief devotes its jurisdictional argument to two primary points: first, plaintiff argues that the health system's vertically managed organizational structure is evidence of centralized parental control, and second, plaintiff asserts that Integration, Too!—defendants' system-wide steering committee—wields substantial power over the day-to-day operations of each system subsidiary and affiliate. (See Doc. 92, *passim*). Plaintiff also highlights shared officers among system entities, confused reporting structures, and a unified public image as evidence of an alter ego relationship. (See Doc. 102 at 1-8). Plaintiff argues that these factors, both individually and *in toto*, justify exercise of jurisdiction over the out-of-forum entities. The court analyzes all of this evidence through the prism of the alter ego jurisdiction factors identified in Chocolate II.[5]

### 1. Ownership of Stock

The first factor courts consider in evaluating corporate dependence is whether the parent corporation is the sole or principal owner of the subsidiary corporations' stock. See *In re* Chocolate II, 674 F. Supp. 2d at 598 (citing Simeone, 360 F. Supp. 2d at 675; Genesis Bio. Pharms. v. Chiron Corp., 27 F. App'x 94, 98 (3d Cir. 2002)). Defendants concede that UHSI is the sole owner or "member" of

---

[5] The Chocolate II factors are not an exclusive checklist. (See Doc. 58 at 15 ("No single factor is determinative of an alter ego relationship, and the court may consider any evidence bearing on the existence of such.")). The court thus considers only those factors relevant to the jurisdictional evidence adduced *sub judice*.

defendants UHSHI, DVH, TTHH, ISLC, ISLCHC, and PHCI. (See Doc. 28 at 4-8 (outlining ownership details)). Defendants emphasize, however, that UMA is a New York corporation, owned exclusively by physicians licensed to practice in New York state. (See Doc. 28 at 8 (outlining UMA structure)); see also N.Y. Bus. Corp. Law 1501 *et seq.* As noted *supra*, record evidence establishes that despite this paper formality, UMA is an active affiliate of the health system. The UHSI "Composition of Corporate/Subsidiary Boards" chart for 2011-2012 lists UMA as an affiliate, (see Pl.'s Ex. B, ECF No. 92-2), and the "UHS Entity/Top Management Positions" chart similarly includes UMA management. (See Pl.'s Ex. A at 4, ECF No. 92-1 at 4). Moreover, UHSI's 2011 Management Structure chart establishes a direct reporting relationship between Salanger and Alan Miller, in his role as president of UMA.[6] (See Pl.'s Ex. 64 at 2, ECF No. 92-7 at 93). This evidence deflates defendants' attempt to distance UMA from the rest of the health system.

The court recognizes, as defendants emphasize, that common ownership by itself is insufficient to create an alter ego relationship. See, e.g., Kehm Oil Co., 537 F.3d at 300-01. Nonetheless, sole ownership is an important consideration when determining whether to exercise alter ego jurisdiction, see *In re* Chocolate II, 674 F. Supp. 2d at 598, and weighs in favor of a finding that UHSI and UHSHI are alter egos of each subsidiary and affiliate.

---

[6] The document cited refers to UHS Medical Group rather than UMA. This inconsistency is due to nomenclature changes accompanying the 2008 rebranding initiative. The court refers to defendant UHS Medical Group as UMA throughout this memorandum.

### 2. Commonality of Officers/Directors and Shared Managerial/Supervisory Personnel

Defendants contend that each subsidiary is a "separate entity" and that each maintains its own officers and boards of directors; as such, defendants urge, alter ego jurisdiction does not exist. (See Doc. 99 at 11). Defendants concede, however, that UHSI and UHSHI do "share certain employees and Directors" with system subsidiaries. (Id.) Defendants' concession fails to fully expose the substantial—and many—redundancies in the system's various organizational charts.[7] The record reveals that defendants regularly exchange managerial and supervisory personnel and that there is a pervasive commonality of officers and directors in the UHS system.

For example, Matthew Salanger, in his capacities as president of UHSI and UHSHI, sits on the board of nondefendant subsidiary Chenango Memorial Hospital as well as the boards of defendants UHSI, UHSHI, PHCI, and TTHH. (See Pl.'s Ex. B, ECF No. 92-2). In fact, Salanger serves as the second vice chair on the board of directors for Pennsylvania-based defendant PHCI as well as TTHH. (See id.) He testified that he has served on the governance and nominating committees for both PHCI and TTHH, and previously served on the PHCI executive compensation committee, which reviewed and approved the annual salary of Joseph Cerra. (See UHSI Rule 30(b)(6) Dep. I (Salanger) 153:21-154:24, Aug. 25, 2014, ECF No. 92-6 at 143-44 (herein "UHSI Dep. I")). Relatedly, plaintiff notes that the top officer at

---

[7] The court notes that the mere existence of *multiple* organizational charts for the entire system itself evinces a certain connectivity among the various entities. (See, e.g., Pl.'s Ex. 64 at 2-4, ECF No. 92-7 at 93-95 (Management Structure chart); Pl.'s Ex. A at 1-4, ECF No. 92-1 at 1-4 (Entity/Top Management Positions chart)).

Pennsylvania-based PHCI also serves as the vice president of home care, long term care and physician practices for UHSI and as the vice president of physician practices for UHSHI. (See Doc. 92 at 7-10 (citing Pl.'s Ex. A at 1-2, ECF No. 92-1 at 1-2)). Plaintiff is correct, and defendants concede, that Cerra serves in each of those roles for UHSI and UHSHI while concurrently serving as the chief executive and president of both PHCI and TTHH. (See Pl.'s Ex. A at 1-2, ECF No. 92-1 at 1-2; see also Cerra Dep. 34:3-35:23, Sept. 9, 2014, ECF No. 92-6 at 3-4). UHS's Management Structure Chart for 2011 indicates that Cerra, in his role as the top officer of PHCI and TTHH, reports directly to Salanger at UHSI and UHSHI, despite defendants' contentions of well-defined corporate boundaries. (See Pl.'s Ex. 64 at 2, ECF No. 92-7 at 93). This commonality of management bolsters plaintiff's allegation that the same individuals charged with managing the parent corporation also control each of the subsidiary and affiliate entities.

Salanger and Cerra are not the only members of the UHSI and UHSHI senior teams who serve in dual roles throughout the system. The UHSI board appoints many of its own members, called "S members," to the boards of its respective affiliates annually. (See Doc. 99 at 12 (defendants admit that "UHSI[] appoints a limited number of Board members for each of its Affiliates known as S members . . . [and] may ask an employee of UHSI, UHSHI or another Affiliate to sit on an Affiliate Board as an S member")). Defendants observe, and organizational charts confirm, that UHSI-appointed board members do not constitute the majority of a subsidiary board for any entity. (See id. at 11-12). Nonetheless, as one of the Chocolate II factors, the fact that Salanger appoints several members of his senior

team to each subsidiary board of directors is relevant to the court's analysis. In the case of PHCI and TTHH, both Salanger and UHSHI board member Ferris Akel serve as "S members" on the subsidiaries' identical eight (8) member boards. (See Pl.'s Ex. A, Doc. 92-1 at 1). Salanger also appointed Cerra, Robin Kinslow-Evans (UHSI's vice president of strategic planning), Natalie Thompson (a UHSI board member), and Nancy Rongo (UHSI's vice president of quality and patient safety) as S members to the twelve-member boards overseeing defendants ISLC and ISLCHC. (See Pl.'s Ex. A at 1, ECF No. 92-1 at 1; Pl.'s Ex. B, ECF No. 92-2; see also Pl.'s Ex. 64 at 2, ECF No. 92-7 at 93). Through these appointments, UHSI has achieved representation within each entity.

Defendants separately contend that, because UMA is formally owned by New-York licensed physicians, neither Salanger nor UHSI control its operations. (Doc. 99 at 10-11). Defendants' argument overlooks relevant evidence connecting UMA to the UHS system and establishing direct reporting relationships between the two. By way of example, James Jewell, MD, who chairs the board of UMA, also sits on the UHSHI board. (See Pl.'s Ex. B, ECF No. 92-2). Further, Alan Miller, who serves as UMA's president, reports directly to Salanger in his capacity as president of UHSI and UHSHI. (See Pl.'s Ex. 64 at 2, ECF No. 92-7 at 93). The UHS Medical Group (UMA) Physician Practice Management chart also establishes a direct reporting relationship from Miller to Cerra, in the latter's role as UHSHI vice president for physician practice, home care, and long term care. (See id. at 3, ECF No. 92-7 at 94). Defendants' contention that UMA is a separate, independent entity rings hollow against this contrary and substantial record evidence.

Defendants posit, per the court's prior ruling, that an overlap of directors or officers is insufficient to establish an alter ego relationship. (Doc. 99 at 11 (citing Doc. 58 at 20)). Defendants are correct, to a degree, but misapprehend a crucial part of the court's prior memorandum: although the court noted that "[o]verlapping directors and officers *do not alone* establish an alter-ego relationship," (Doc. 58 at 20 (emphasis added)), such evidence is one pertinent consideration in the court's analysis *in toto*. *In re* Chocolate II, 674 F. Supp. 2d at 598 (citing Simeone, 360 F. Supp. 2d at 675; Genesis Bio. Pharms., 27 F. App'x at 98). The sheer amount of managerial overlap in the matter *sub judice* suggests a desire by UHSI to maintain control over its subsidiaries. Hence, the court concludes that the commonality of board members and senior officers of the parent, subsidiary, and affiliate entities within the UHS health system suggests an alter ego relationship.

### 3. Unified Marketing Image and Common Trademarks

The court must also consider whether the defendants "share a common marketing image or logos." *In re* Chocolate II, 674 F. Supp. 2d at 598. In other words, the court should ask whether the health system is holding itself out to the public as a single, organic corporate entity. See id.; see also Simeone, 360 F. Supp. 2d at 678. As defendants quickly observe, parent-subsidiary relationships are often marked by common marketing schemes, and parallel or unified public images alone cannot establish alter ego jurisdiction. (See Doc. 105 at 6-7). For example, in *In re* Enterprise Rent-A-Car Wage & Hour Employment Practices Litig., 735 F. Supp. 2d 277 (W.D. Pa. 2010), the court concluded that a "common marketing image and joint use of trademarked logos" owned by a parent, absent "the necessary control by the

defendant parent over the subsidiaries," will not confer alter ego jurisdiction. *In re Enterprise*, 735 F. Supp. 2d at 323. Nonetheless, when coupled with the requisite degree of control, a uniform public image is indicative of an alter ego relationship.

The record in this matter reflects a deliberately unified marketing image, with the UHS moniker incorporated into the name of each system subsidiary and affiliate. Managerial commentary during the rebranding initiative confirms that defendants intentionally created this image. In a 2008 memorandum to Salanger, Boyd noted concerns regarding a perceived "lack of awareness or lack of consumer recognition of system member affiliations . . . in part, due to inconsistent or absent reinforcement of our 'master brand.'" (Pl.'s Ex. 98 at 1, ECF No. 92-7 at 103; UHSI Dep. III 30:1-31:14). Boyd urged that, "going forward, [brand reinforcement] will be best done at the system level." (UHSI Dep. III 30:1-31:14, ECF No. 92-7 at 240-41; see Pl.'s Ex. 98 at 1, ECF No. 92-7 at 103). During a 2009 Integration, Too! meeting, Boyd recommended the following changes: (1) renaming defendant DVH to UHS Delaware Valley Hospital; (2) renaming nondefendant Wilson Medical Center to UHS Wilson Medical Center; (3) renaming nondefendant Binghamton General Hospital to UHS Binghamton General Hospital; (4) renaming ISLC and ISLCHC to UHS Senior Living at Ideal; (5) consolidating TTHH and PHCI and renaming them UHS Home Living; and (6) renaming UMA to UHS Medical Group. (UHSI Dep. III 53:16-56:3, ECF No. 92-6 at 255-57; Pl.'s Ex. 100 at 1-2, ECF No. 92-7 at 115-16). Boyd testified that the decision to implement this centralized marketing plan was reached during an Integration, Too! meeting by Integration, Too! members, *to the exclusion*

*of subsidiary entities' boards of directors or management teams*. (<u>See</u> UHSI Dep. III 32:17-33:15, ECF No. 92-6 at 242-43).

Boyd's explanation of UHSI's motivation to rebrand speaks volumes as to defendants' ultimate, if unspoken, intent. For example, Boyd described the new entity names as including the UHS mark with merely a "location delimiter," demonstrating that UHS senior executives consider UHS to be the governing entity with multiple "locations" or branches. (<u>See</u> Pl.'s Ex. 105 at 6, ECF No. 92-7 at 122). She explained that, as part of the rebranding initiative, "the UHS name was intended to be larger and more prominent than the individual facility names," a move which logically indicates to consumers and the public that UHS is (or has become) the governing entity of each individual facility. (<u>See</u> UHSI Dep. III 62:25-63:5, ECF No. 92-6 at 260-61). The record evidence unequivocally suggests an intent on the part of UHSI and UHSHI senior management to create a clear public image espousing centralized corporate control over a departmentalized, but unified, health system.

Like common directorship and centralized ownership, common marketing images, standing alone, are insufficient to establish an alter ego relationship. (<u>See</u> Doc. 58 at 20 (quoting <u>*In re* Enterprise</u>, 735 F. Supp. 2d at 323)). However, the fact that the defendants intentionally steer the public's perception of the system to one of a singular, integrated corporate entity is an important factor in the court's analysis. <u>E.g.</u>, <u>Simeone</u>, 360 F. Supp. 2d at 678 (highlighting consumer perception and defendants' indistinct indistinguishable public image as critical factors in alter ego determination). The system executives' stated intent of establishing an

indistinct identity weighs heavily in favor of an alter ego finding.  See id. (alter ego relationship exists when entities "projected a common marketing image by continuously holding itself and [codefendant] out to the public as a single entitle that is conveniently departmentalized").

### 4.    Shared Employees, Shared Services

In <u>Chocolate II</u>, the court identified shared employees among system affiliates and shared managerial personnel as additional considerations in the alter ego analysis.  *In re* Chocolate II, 674 F. Supp. 2d at 598 (identifying whether "group members share employees" as pertinent alter ego element).  In other words, the court considers whether the purported structural membrane between entities is observed, as alleged by the system, or is amorphous and easily traversed by both employees or management, as asserted by plaintiff.  <u>Compare</u> *In re* Enterprise, 735 F. Supp. 2d at 324 (holding that parent's provision of a multitude of services to subsidiaries was not alter ego evidence given their adherence to separate corporate boundaries and the nature of the car rental industry) <u>with</u> *In re* Chocolate II, 674 F. Supp. 2d at 614-617 (finding that exchanged employees between subsidiary and parent are *prima facie* evidence of alter ego relationship when those employees then use their interrelationship to influence daily affairs).  The evidence reflects that employees and management throughout the UHS health system can—and routinely do—alternate between entities in various capacities.

As president and chief executive officer of both UHSI and UHSHI, Salanger has complete control over his senior team, and he determines which entity his team members will serve.  In January of 2011, for example, Salanger unilaterally directed

a UHSHI human resources officer to transfer Cerra into a position at UHSI. (<u>See</u>, <u>e.g.</u>, Pl.'s Ex. 13, ECF No. 92-7 at 18 ("Let's put him in UHS.")). Salanger testified that he was not sure which system entity employed Cerra prior to the transition,[8] but that it was strictly his decision to move Cerra to UHSI. (<u>See</u> UHSI Dep. I 161:20-166:6, ECF No. 92-6 at 147-52). Notwithstanding his transition to UHSI, Cerra continued to serve as president and chief executive officer of PHCI <u>and</u> TTHH. (<u>See</u> <u>id.</u> 162:7-17, ECF No. 92-6 at 162 (Salanger testifying that Cerra reports to him as vice president of home care, long term care, and physician practices and simultaneously serves as the head of PHCI and TTHH). Cerra thus shares his managerial services with UHSI, UHSHI, PHCI, and TTHH.

Even a cursory review of the record exposes blurred lines in management of the UHS system. Indeed, the commingling of various executives' functions is so extensive that many of the officers themselves are unable to identify their specific employer or exactly whose interests they serve at any given time. For example, during her deposition, Kinslow-Evans appeared confused as to exactly which UHS entity employs her. (<u>See</u>, <u>e.g.</u>, Kinslow-Evans Dep. 86:17-87:8, Aug. 19, 2014, ECF No. 92-6 at 86-87 (identifying as herself senior management within UHSI *and* UHSHI)). Defense counsel later clarified that Kinslow-Evans is not employed by UHSHI, (<u>see</u> Doc. 92 at 13 n.8); however, Kinslow-Evans nonetheless testified that she is the strategic planner for *each* system entity. (<u>See</u> Kinslow-Evans Dep. 86:17-

---

[8] Cerra clarified that prior to his transition to UHSI, he was employed by PHCI and TTHH as president and chief executive officer. (<u>See</u> Cerra Dep. 35:15-23, ECF No. 92-6 at 4).

87:8, ECF No. 92-6 at 86-87 ("I have the role of strategic planner with all the other entities on their management team.").  More specifically, Kinslow-Evans agreed that "regardless of where [her] paycheck comes from, [she has] a role as Vice President of Strategic Planning with [UHSI] . . . [and] also [has] the same position with *all of the other UHS entities*." (Id. at 86:23-87-8 (emphasis added)).  She noted that she "believe[s] the [system] entities pay for [her] services through a planning fee to [UHSI]."  (Id. 94:25-95:6, ECF No. 99-4 at 40-41).  Moreover, Kinslow-Evans identified other UHSI employees that share their services with the entire system.  For example, although Kay Boland is employed by UHSI and is neither an officer nor board member of ISLC, she has "responsibility over" and provides "direction and oversight" to ISLC.  (Id. 90:5-23, ECF No. 92-6 at 18) (identifying Kay Boland, a UHSI employee, "as the executive over ideal")).  Similarly, Boyd is employed exclusively by UHSI, (see UHSI Dep. III 16:8-22, ECF No. 99-3 at 36), but provides services to each of the system entities.  (See Doc. 99 at 14 ("Ms. Boyd provides services to Affiliates, for which the applicable Affiliates reimburse UHSI.")).[9]

Subsidiary management personnel also serve multiple entities within the system.  Defendants concede that many employees work for both PHCI and TTHH, but maintain that those employees track their time and are paid proportionately for services by the entity they served.  (See Doc. 99 at 13).  Cerra identified several such

---

[9] Defendants allege that "the applicable Affiliates reimburse UHSI" for the services Boyd provides but cite no evidence supporting that proposition.  Kinslow-Evans previously testified that she "believe[s] that the entities pay for [her] services through a planning fee to [UHSI]."  (Kinslow-Evans Dep. 8/19/14, 94:25-95:6).  The court presumes that defendants intend the same assumption to apply to Boyd's shared services.

employees, including: (1) TTHH vice president of finance Cynthia Wine, (2) PHCI vice president of operations Greg Rittenhouse, (3) TTHH human resources director Dawn James, and (4) TTHH vice president of clinical services Karla Dotts. (See Cerra Dep. 82:15-84:24, ECF No. 99-3 at 51-53). Each serves in an identical capacity for PHCI and TTHH and "splits" their time between the entities. (See id.) Cerra explained that these employees track their time with timecards and "charge back" their time to the receiving entity on a monthly basis. (See id.)

Further, pursuant to "intercompany agreements," other employees are employed by one system entity while providing services to another, for which the recipient entity compensates the primary employer. (See, e.g., Dec. of Ronald Cerow ¶¶ 2-3, ECF No. Doc. 99-5 (Ronald Cerow, administrator of UHS Chenango, acts as "acting administrator" for defendants ISLC and ISLCHC, and those entities reimburse UHS Chenango for his time)). According to defendants, "UHSHI and the other Affiliates pay UHSI under Contribution Agreements" to receive such services, eliminating any alter ego concerns that such arrangements might trigger. (Doc. 99 at 15).[10] Nonetheless, the sheer volume of overlapping employees, shared services, and identical cross-system roles and functions, together with each of the previous factors, is evidence of an alter ego relationship. See In re Latex Gloves, 2001 WL 964105, at *5 (finding alter ego relationship when, inter alia, parent corporation "and its subsidiaries used the same employees interchangeably," and those shared employees wield substantial influence within the corporate family). When coupled

_____

[10] Defendants cite broadly to "Cerra Dec., No. 1" in support of this proposition. The record before the court contains only Cerra's second declaration, and nothing in that document supports defendants' proposition.

with the authority vested in many of the system's shared employees, the court holds that this factor lends favor to a finding of an alter ego relationship.

### 5. Centralized Control

The court's analysis turns next to the most critical phase of the alter ego analysis: whether the parent corporation(s) exercise a sufficient degree of control over the remainder of the health care system to compel the court to disregard the entities' corporate boundaries. As defendants emphasize, some level of control is inherent in every parent-subsidiary relationship, especially when the parent is the sole owner or member of each subsidiary. See In re Latex Gloves, 2001 WL 964105, at *3 (observing that "'due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where . . . parent does not exercise an unusually high degree of control over the subsidiary'" (quoting Ctrl. States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 943 (7th Cir. 2000)). The court must instead undertake a fact-intensive analysis and determine whether the parent exercises such complete and pervasive control as to transcend traditional corporate boundaries for jurisdictional purposes. See In re Enterprise, 735 F. Supp. at 324-25 (contrasting In re Chocolate with In re Latex Gloves and emphasizing that the "failure to adhere to corporate boundaries" is the hallmark of an alter ego relationship). Record evidence overwhelmingly supports a finding that UHSI and UHSHI, through centralized senior management, exercise such control over each of the health system's various entities.

Plaintiff points first and most emphatically to the Integration, Too! "steering committee" created by Salanger shortly after he assumed the roles of president and

chief executive officer of UHSI and UHSI.  (See Doc. 92 at 14-29).  The committee

identifies its mission as to "[d]evelop, implement, and monitor activities that

achieve our vision to become a *tightly integrated system*."  (Pl.'s Ex. 49 at 1, ECF No.

92-7 at 77 (emphasis added)).  According to executive testimony, the Integration,

Too! committee meets twice a week for three or four hours, and its purpose is "to

get everyone's opinions with regard[] to different opportunities and bring their

thoughts together in a consensus building form."  (UHSI Rule 30(b)(6) Dep. II

(Gomulka) 72:2-16, Sept. 5, 2014, ECF No. 92-6 at 184 (herein "UHSI Dep. II")).

Salanger explained that the committee represents a collection of UHSI senior

officers and management from each of the various system entities.  (See UHSI Dep.

I 30:15-31:10, ECF No. 99-4 at 54-55 (testifying that the "role and purpose of

Integration, Too!, which is really a group of individuals that have representation of

various elements of the system . . . is to coordinate activities as best as possible

towards the advancement of the strategic goals of UHS.")).

The Integration, Too! charging document referenced *supra* identifies the

following individuals as formal members of the steering committee, appointed by

Salanger:

- Matthew Salanger – president and chief executive officer of UHSI and UHSHI;
- John Carrigg – senior vice president and chief operating officer of UHSI and UHSHI;
- Joseph Cerra – senior vice president of home care, long term care, and physician practices for UHSI, senior vice president of physician practices for UHSHI, and president and chief executive officer of PHCI and TTHH;
- Rajesh Davé – executive vice president of clinical integration and chief medical officer for UHSI and UHSHI;

- Robert Gomulka – senior vice president and chief financial officer for UHSI and UHSHI;
- Angela Iacovelli – co-executive director and vice president of physician practices for UMA;
- Robin Kinslow-Evans – vice president for strategic planning for UHSI and UHSHI;
- Drake Lamen, MD – president and chief executive officer of UHS Chenango;
- Alan Miller, MD – president of UMA;
- Maria Motsavage – president, chief executive officer and administrator of ISLCHC and ISLC; and
- David Polge – president and chief executive officer of DVH.[11]

(See Pl.'s Ex. 49 at 1, ECF No. 92-7 at 77). More recent additions to the Integration, Too! team include Kay Boland, vice president of patient care services and chief nursing officers for UHSI and UHSHI; Christina Boyd, vice president of community relations for UHSI and UHSHI; and Nancy Rongo, vice president and chief quality officer for UHSHI. (See id.; see also Kinslow-Evans Dep. 96:19-97:25, ECF No. 99-2 at 21-22). In addition, testimony and other documents establish that other senior system personnel participate in meetings on an *ad hoc* basis. For example, Carrigg stated that UHSI general counsel are members of Integration, Too! but participate only on an as-needed basis. (See Carrigg Dep. 54:11-54:19, Sept. 11, 2014, ECF No. 99-3 at 90) (noting that both former general counsel Donald Carlin and current general counsel Jeffrey Alexander participate in Integration, Too!)). This evidence demonstrates that many of the individuals in charge of the daily operations of the subsidiary entities also participate in twice-monthly, hours-long "consensus-building" sessions with UHSI senior executives. (E.g., PHCI Rule 30(b)(6) Dep.

---

[11] The document also identifies "April Rozboril, Staff." (Pl.'s Ex. 49 at 1, ECF No. 92-7 at 77). Ms. Rozboril's role within the UHS system is otherwise unclear from the record.

(Cerra) 14:19-16:7, Sept. 8, 2014, ECF No. 92-6 at 41-43 (herein "PHCI Dep.") (Cerra testifying that he is "responsible for the day-to-day management and governance" and for "planning, controlling and governance, [and] reporting to the board of directors" as the head of PHCI and TTHH in addition to his role serving on the health system's steering committee)).

Plaintiff posits that, because many key members of Integration, Too! and UHSI business unit leaders also serve as heads of subsidiary and affiliate service providers, any decision made at Integration, Too! represents an effort to impose UHSI's will upon subsidiary operations. Defendants respond that the committee is nothing more than an "idea-sharing" forum for the system's top management to identify valuable opportunities. (See Doc. 99 at 18-19 (categorizing Integration, Too! as a "sounding platform" and "a forum to exchange information and ideas")). The question for the court is whether Integration, Too! merely shares ideas and encourages discussion or, as plaintiff alleges, reaches and implements system-wide operating decisions. A review of record evidence reveals the latter to be true.

Plaintiff highlights Integration, Too!'s rebranding decision, and various elements of the rebranding process, as strong evidence of parent control over the subsidiary entities. (See Doc. 92 at 25-29). Defendants do not dispute that, from 2008 to 2011, Integration, Too! coordinated a system-wide rebranding initiative that applied to all system entities. (See, e.g., Doc. 105 at 6-7). Importantly, Boyd testified that no individual subsidiary or affiliate board approved the rebranding initiative— rather the decision was reached by system executives during an Integration, Too! meeting, and then implemented by Integration, Too! members within their various

operating entities.  (See UHSI Dep. III 99:15-100:8, ECF No. 92-6 at 273-74 (Boyd stating that neither PHCI nor any other entity's board "officially voted to adopt or approve the branding initiative or UHS logo"); see also id. 32:3-33:15 (testifying that decision to implement her rebranding recommendations was reached "at a meeting we call Integration, Too!")).  Defendants point to no contrary evidence supporting their assertion that Integration, Too! is not vested with decisionmaking authority.

Not only did the rebranding process modify the outward image of the system, it brought with it internal, structural changes.  The rebranding initiative centralized all communications-based functions with Boyd, in her role as UHSHI vice president of community relations, and her team.  (See Pl.'s Ex. 68 at 1, ECF No. 92-7 at 96 ("All communications, pamphlets, patient education, etc. will now be centralized through Community Relations."); see also UHSI Dep. III 31:20-33:15, 41:24-42:23, ECF No. 92-6 at 241-45 (Boyd noting that Integration, Too! members approved centralization)).  The committee also "agreed that all of the Community Relations employees will report to C. Boyd, although they may be on payrolls of the various subsidiaries."  (Pl.'s Ex. 68 at 2, ECF No. 92-7 at 97; see also UHSI Dep. III 31:20-33:15, 41:24-42:23, ECF No. 92-6 at 241-45)).  Hence, Integration, Too! unilaterally restructured the roles and reporting responsibilities of operating entity employees without any formal vote or input from operating entity boards.  Such disregard for corporate formalities presents strong evidence of an alter ego relationship.  See In re Chocolate II, 674 F. Supp. 2d at 599 n.25 (observing that a "court should not defer to corporate boundaries that the defendant itself has disregarded").

Plaintiff further emphasizes that subsidiary and affiliate operating plans are reviewed, discussed, and influenced at the parent corporation level, with the goal of fitting each cohesively into the system-wide strategic plan. (See Doc. 92 at 20-21). In their opposition papers, defendants concede that subsidiary operating plans "are another issue discussed at Integration, Too!," but contend that ultimate review and authority over each entity's plan rests exclusively with the operating entity's board. (See Doc. 99 at 22). The record again refutes defendants' contention.

As noted *supra*, Kinslow-Evans serves as the vice president of strategic planning for UHSI. (See Pl.'s Ex. A at 1, ECF No. 92-1 at 1; see also Kinslow-Evans Dep. 86:2-87:8, ECF No. 92-6 at 15-16 (explaining that notwithstanding her title and formal employer, she serves as the strategic planner for "all the other entities on their management team")). Kinslow-Evans explained that the system's strategic plan is developed with her oversight over the course of a system-wide leadership conference and is enacted every three years. (See id. 78:3-80:19, ECF No. 92-6 at 8-10). Cerra testified that "the system or the UHS, Inc., strategic plan . . . generally sets the direction of the integrated care that we provide . . . [and] falls into a couple major categories like financial performance, growth, and quality." (Cerra Dep. 16:6-11, ECF No. 99-3 at 69).

According to Salanger, the individual entities' operating plans must "be within the context or framework of the guidance set by the [system] strategic plan" created by Kinslow-Evans and the UHSI planning team. (See UHSI Dep. I 91:6-17, ECF No. 92-6 at 136). Kinslow-Evans testified that she "believe[s]" that UHSI votes only on its own operating plan, (Kinslow-Evans Dep. 139:25-140:7, ECF No. 99-4 at

43-44), but also explained that she will "create the—or help develop the individual operating plans that are then provided to the entities who then work on those plans to complete them." (Id. at 146:4-15). Not only must the entity operating plans conform to a UHSI-established format, (see Salanger Dep. 54:11-55:4, Aug. 26, 2014, ECF No. 92-6 at 74-75), record evidence demonstrates that nearly every aspect of the operational planning process itself is controlled by Kinslow-Evans and her UHSI strategic planning team. For example, according to a 2011 Operating Plan Production Schedule produced by plaintiff, all subsidiary operating plans are preliminarily reviewed by Integration, Too!, before being submitted to Kinslow-Evans "for drafting and review" in mid-October; "CEO-approved drafts" are then turned over to Gomulka and Salanger for "review[,] [d]iscussions, and revisions as needed." (Pl.'s Ex. 24 at 9, ECF No. 92-7 at 57). In describing her role as strategic planner for each entity, Kinslow-Evans explained that she "help[s] assemble the operating plan" for the subsidiaries. (See Kinslow-Evans Dep. 136:3-9, ECF No. 99-4 at 42 (rejecting counsel's characterization of her role as "preparing operating plans")). This evidence, all told, quashes defendants' assertion that strategic and operational planning is left exclusively to the operating entities.

Other operational-level issues are frequently raised and resolved at Integration, Too! meetings. The committee's charging document identifies the areas "to be addressed" by Integration, Too! members as follows: (1) system policy and development, both administrative and human resources, (2) operating plan development, (3) central business office development, (4) debt restructuring activities, (5) primary care and physician recruitment, (6) UHS branding activities,

(7) clinical integration, (8) ISLC/home care integration, (9) Wellspring system labor analysis, (10) nursing practice standardization, (11) system clinical and business IT development, (12) service line 360° reviews, and (13) referral tracking.[12] (See Pl.'s Ex. 49 at 1, ECF No. 92-7 at 77). The vast range of issues addressed by Integration, Too! clearly shows that the committee's governing role transcends the passive parental involvement common in corporate/affiliate relationships. Cf. *In re Enterprise*, 735 F. Supp. at 323 (observing that mere "recommendations and best practices" suggestions by parent do not establish unique degree of control); see also *In re* Chocolate II, 674 F. Supp. 2d at 602 (contrasting parent's promulgation of a "group-wide corporate vision" with circumstances in which parent "dictate[s] the minutiae of subsidiary operating activity"). In fact, many topics discussed at Integration, Too! meetings mirror those identified by the court in Chocolate II, when the court held that foreign Cadbury parent corporations were the alter ego of their domestic subsidiaries in large part as a result of a centralized management committee (the "CEC") that wielded extensive control over these exact types of "common operational functions." See *In re* Chocolate II, 674 F. Supp. at 615-16 (identifying "advertising campaigns, executive recruitment, . . . outsourcing, . . . [and] investor relations activities" as functions appropriately left to subsidiaries' discretion).

The record before the court creates an even more compelling case of centralized control than the CEC in Chocolate II. As noted *supra*, in Chocolate II, Cadbury's CEC was comprised "of the heads of the Cadbury group's various

---

[12] The fourteenth line item on the exhibit submitted to the court is illegible.

business units," with many of the principals of those business units simultaneously serving as operating entity executives.  See *In re* Chocolate II, 674 F. Supp. 2d at 591-92.  Operating entity executives thus assumed a level of control over global activities through the CEC.  See id.  The CEC met only six to nine times per year. See id.  Integration, Too!, by contrast, is comprised of a more interrelated and overlapping group of individuals: Salanger, in his role as president of UHSI and UHSHI, oversees the committee and invites not only his business unit leaders (who serve dual roles as operating entity executives), but also other UHSI and UHSHI officers and all other operating entity presidents who do not serve as business unit executives.  (See Pl.'s Ex. 49 at 1, ECF No. 92-7 at 77).  Thus, employees throughout the UHS system participate in global, system-level discussions and decisionmaking. Moreover, Integration, Too! meets much more frequently than the CEC: in addition to an annual, weekend-long leadership conference attended by Integration, Too! members, (see Kinslow-Evans Dep. 78:10-79:3, ECF No. 92-6 at 8-9), Integration, Too! meets twice per month for three or four hours at a time.  (See UHSI Dep. II 72:2-16, ECF No. 92-6).  And, perhaps most significantly, Salanger intended the steering committee to centralize and "tightly integrate" the entire health system. (See Pl.'s Ex. 49, ECF No. 92-7 at 77).

Defendants emphasize a perceived distinction between "control" and "decisionmaking," terms used by plaintiff, and what they consider to be "consensus building," "coordination," and "oversight."  (See Doc. 99 at 19 (citing Salanger Dep.

30:15-31:10, ECF No. 99-4 at 54-55)).[13]  The defendants' argument is, for all practical

purposes, one of semantics.  In any event, the evidence belies the inference that

defendants seek: that UHSI and UHSHI do not and cannot control the system

subsidiaries.  UHSI, via Integration, Too!, can and does exercise substantial control

over the operating entities.  As previously described, plaintiff has shown that this

control is so pervasive that it extends well beyond "promulgat[ion] of a group-wide

corporation vision," *In re* Chocolate II, 674 F. Supp. 2d at 602, surpassing the

"degree of control [that] naturally flows from a parent-subsidiary relationship," *In

re* Enterprise, 735 F. Supp. 2d at 322-23, and instead represents the very

embodiment of an alter ego relationship.  Hence, plaintiff has offered *prima facie*

evidence which, measured against the Chocolate II benchmarks, permits a judicial

finding of alter ego jurisdiction over UHSI, UHSHI, and each subsidiary and

affiliate defendant.

### 6. Vertical Management and Business Units

One final consideration that impacted the court's decision in Chocolate II is

equally resonant in the case at bar: UHSI and UHSHI manage the health care

system vertically, through the creation of service-aligned business units, rather than

by corporate boundaries.  In Chocolate II, the court emphasized that this corporate

feature strongly evinces an alter ego relationship, noting that "senior executives of

---

[13] Quite to the contrary, the court notes that the Integration, Too! charging
document identifies decisionmaking as an element of its responsibilities. (See Pl.'s
Ex. 49 at 1, ECF No. 92-7 at 77 ("Key elements of oversight, implementation, and
achievements will be tracked/logged and may include: *decisions made*, departments
consolidated, positions deleted and costs avoided." (emphasis added)).

Cadbury operating entities double as *both* the leaders of business units *and* as the heads of production activities." <u>In re</u> Chocolate II, 674 F. Supp. 2d at 614. As an example, the court highlighted business unit director Jim Chambers, who served as both chief executive officer of Cadbury USA, the domestic operating entity, as well as the head of the foreign parent's American Confectionary business unit. <u>See id.</u> at 614-15 (commenting that, in these roles, Chambers was responsible for all confectionary products produced in North America regardless of whether they were manufactured by the domestic subsidiary). Chambers also served on the CEC which, like Integration, Too!, effectively controlled each subsidiary entity. <u>Id.</u>

Similarly here, Joseph Cerra serves concurrently as vice president of the home care, long term care, and physician practices unit and as president and chief executive officer of two system operating entities. (<u>See</u> Pl.'s Ex. A at 1-2, ECF No. 92-1 at 1-2; <u>see also</u> Cerra Dep. 34:3-35:23, ECF No. 92-6 at 3-4). In his role with UHSI, Cerra oversees all home care, long term care, and physician practices issues and personnel system-wide. Of particular note, Cerra oversees both Alan Miller, president of UMA, (<u>see</u> Pl.'s Ex. 64 at 3, ECF No. 92-7 at 94), and Maria Motsavage, president of ISLC, (<u>see id.</u> at 4, ECF No. 92-7 at 93), responsibilities which far exceed his role as head of PHCI and TTHH. Again analogous to <u>Chocolate II</u>, Cerra is also a member of the system-wide management committee created by the president of the parent corporations. (<u>See</u> Pl.'s Ex. 49, ECF No. 92-7 at 77); <u>also</u> <u>In re Chocolate II</u>, 674 F. Supp. 2d at 615 (holding that "business units aligned with product groups rather than corporate boundaries" and managed by operating entity management supports alter ego jurisdiction)). These vertical relationships

trigger the same concerns in this matter as in <u>Chocolate II</u>, specifically that such a management structure permits parent corporations to "conscript[] employees of their subsidiaries to discharge group-wide management functions across corporate boundaries." <u>Chocolate II</u>, 674 F. Supp. 2d at 615 (citing <u>Cali v. E. Coast Aviation Servs., Ltd.</u>, 178 F. Supp. 276, 289 (E.D.N.Y. 2001); <u>Latex Gloves</u>, 2001 WL 964105, at *6). This additional element supports a finding of an alter ego relationship.

**B.  Fair Play and Substantial Justice**

Personal jurisdiction must ultimately comport with the traditional notions of fairness and substantial justice outlined by the Supreme Court in <u>International Shoe</u>. <u>See</u> <u>Int'l Shoe</u>, 326 U.S. at 316; <u>accord</u> <u>Simeone</u>, 360 F. Supp. 2d at 678-79 (holding that even when an alter ego relationship is shown, "'personal jurisdiction must ultimately be consistent with traditional notions of fair play and substantial justice." (quoting <u>*In re* Latex Gloves</u>, 2001 WL 964105, at *6)). The Supreme Court has not expressly applied fair play and substantial justice principles to general jurisdiction analyses, <u>see</u> 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5, at 521-23 (2002) (observing that the Court "has never commented on the role of the . . . factors in the context of general jurisdiction"), but several courts of appeal and district courts have concluded that fairness and substantial justice factors are relevant to the inquiry. <u>See</u> <u>Trierweiler v. Croxton & Trench Holding Corp.</u>, 90 F.3d 1523, 1532-33 (10th Cir. 1996); <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 570, 568, 573 (2d Cir. 1996); <u>Amoco Egypt Oil Co. v. Leonis Nav. Co.</u>, 1 F.3d 848, 851 (9th Cir. 1993); <u>see</u> <u>also</u> <u>*In re* Chinese Manufactured Drywall Prods. Liab. Litig.</u>, 767 F. Supp. 2d 659, 664-65 (E.D.

La. 2011); <u>Hartford Casualty Ins. Co. v. Foxfire Printing & Packaging</u>, No. 10-C-50298, 2011 WL 4345850, at *6 (N.D. Ill. Sept. 15, 2011); <u>In re Chocolate II</u>, 674 F. Supp. 2d at 617-18 & n.58; <u>Simeone</u>, 360 F. Supp. 2d at 678-79; (quoting <u>In re Latex Gloves</u>, 2001 WL 964105, at *6)).

Factors relevant to the fairness and substantial justice analysis include: (1) the burden to the defendants of litigating in the forum, (2) the forum's interest in adjudicating the lawsuit, (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) the interstate judicial system's interest in the efficient resolution of conflicts, and (5) the several states' "shared interest in furthering fundamental social policies." <u>Pennzoil Prods. Co. v. Colleli & Assocs.</u>, 149 F.3d 197, 205-06 (3d Cir. 1998) (quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462 (1985)). In the matter before the court, these factors favor exercising jurisdiction over the New York-based defendants. The health system operates in both Pennsylvania and New York, bisecting the border shared by the two states. The court finds that defendants face no substantial burden litigating in a neighboring forum. Given PHCI's undisputed use of the system's UHS brand within the forum state, at least some of the harm alleged by plaintiff occurred in the forum. Moreover, in light of the various defendants' participation in an integrated health system conducting business in Pennsylvania, defendants could reasonably expect to be subject to suit in this state. <u>See</u> <u>In re Latex Gloves</u>, 2001 WL 964105, at *6 (holding that fairness and substantial justice concerns are satisfied given the defendants' identity as a singular corporate family and defendants' "reasonable expectations as to suability"). For all of these reasons, the court concludes that its exercise of

jurisdiction over the entire health system is not inconsistent with traditional notions of fair play and substantial justice.

## V.    Conclusion

The jurisdictional evidence shows that the UHS system is a complex, integrated, and centralized health care system rather than individual operating companies within a passive parent umbrella.  The court concludes that UHSI possesses pyramidal control over the entire health care system.  The fully integrated organizational structure coupled with the extensive commingling of executive functions refutes defendants' assertions of subsidiary independence.  This is precisely the type of centralized control contemplated by alter ego jurisprudence. The court has already concluded that PHCI, as a Pennsylvania-based department of the UHS system, is subject to personal jurisdiction in this forum.  In light of their alter ego relationship with PHCI, the court now concludes that the balance of the system defendants are similarly within the court's jurisdictional reach.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      February 10, 2015