**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UHS OF DELAWARE, INC.,** | : | **CIVIL ACTION NO. 1:12-CV-485** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED HEALTH SERVICES,** | : | |
| **INC.,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## **MEMORANDUM**

The instant matter arises from a trademark dispute between plaintiff UHS of Delaware, Inc. ("UHS Delaware") and defendants United Health Services, Inc., ("United Health Services"), United Health Services Hospitals, Inc., Professional Home Care, Inc., Twin Tier Home Health, Inc., Ideal Senior Living Center, Inc., Ideal Senior Living Center Housing Corporation, Delaware Valley Hospital, Inc., and United Medical Associates. Before the court are UHS Delaware's motion (Doc. 150) for summary judgment and defendants' motion (Doc. 151) for partial summary judgment.

## I.      **Factual Background and Procedural History**[1]

The factual background of this case is detailed in several prior opinions,

familiarity with which is presumed.[2]  UHS Delaware is the healthcare management

company for Universal Health Services, Inc. ("Universal").  (Doc. 157, Ex. 1 ¶ 3).[3]

Universal's subsidiaries own and operate more than 235 acute care and behavior

health facilities and surgery centers in a number of states throughout the country.

(Id.)  Universal owns no subsidiaries or affiliates, and does not operate, in the state

of New York.  (See Doc. 153, Ex. D at 3-4).  UHS Delaware does not itself provide

healthcare services; instead, it manages an affiliated network of healthcare service

providers.  (See Doc. 157, Ex. 1 ¶ 3).

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial.  See id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 153, 155, 161-5, 163-1).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] See UHS of Delaware, Inc. v. United Health Servs., Inc., No. 1:12-CV-485, 2013 WL 1308303 (M.D. Pa. Mar. 28, 2013); UHS of Delaware, Inc. v. United Health Servs., Inc., No. 1:12-CV-485, 2015 WL 539736 (M.D. Pa. Feb. 10, 2015); UHS of Delaware, Inc. v. United Health Servs., Inc., No. 1:12-CV-485, 2015 WL 7294454 (M.D. Pa. Nov. 19, 2015).

[3] For affidavits and declarations, the court will cite to the applicable enumerated paragraph(s).  Other exhibit citations, with the exception of deposition transcripts, will reflect pagination assigned by the Electronic Case Filing system. Citations to briefs will correspond to original word processing pagination.

UHS Delaware owns federal registrations for two trademarks: (1) the UHS word mark, bearing U.S. Registration No. 1,696,433 ("the '433 mark"), and (2) the UHS stylized mark, bearing U.S. Registration No. 2,741,663 ("the '663 mark") for use in connection with hospital services and hospital management services.  (Id. Exs. 2, 4; see Doc. 155 ¶ 1; Doc. 161-5 ¶ 1).  The stylized mark appears as follows:

**UHS**

(Doc. 157, Ex. 4).  UHS Delaware owns both marks via assignment from its parent, Universal.  (Id. Ex. 6).  The '433 registration issued on June 23, 1992, and the '663 registration issued on July 29, 2003.  (Doc. 153 ¶¶ 27-28; Doc. 157, Exs. 2, 4).  The marks have achieved "incontestable" status under the Lanham Act.  (Doc. 155 ¶ 1; Doc. 161-5 ¶ 1); see also 15 U.S.C. § 1065.

Defendants are eight nonprofit corporations which together comprise an integrated healthcare system headquartered in the southern tier of New York. (Doc. 153 ¶¶ 1, 5-14).  Defendants include: (1) United Health Services, the healthcare system's parent entity; (2) United Health Services Hospitals, Inc., a subsidiary of United Health Services which operates, inter alia, Binghamton General Hospital, Ideal/Wilson Medical Center, and eighteen physician practice clinics; (3) Delaware Valley Hospital, Inc., a 25-bed critical access hospital; (4) Professional Home Care, Inc., an advanced home care service; (5) Twin Tier Home Health, Inc., a certified home health care agency; (6) Ideal Senior Living Center, Inc., a skilled nursing facility and long term home health care program; (7) Ideal Senior Living Center Housing Corporation, an independent living and adult care facility; and (8) United

3

Medical Associates, P.C., a multi-specialty medical practice group comprising 185 physicians and 128 advanced practice providers.  (Id. ¶¶ 5-14).  United Health Services does not have any facilities outside of New York state.  (Id. ¶ 2).

The United Health Services healthcare system began using the acronym "UHS" in approximately 1982.  An employee newsletter issued that year was titled "UHS Life."  (Id. ¶ 17).  Defendants issued seven subsequent newsletters titled "The UHS News" between 1983 and 1990.  (Id.)  United Health Services also used "UHS" in occasional pamphlets and certain annual reporting.  (Id.)  News articles and reports regularly referred to the system as "UHS" during this time.  (Id. ¶ 22).  In 1990 or 1991, United Health Services erected monument signs outside of the Binghamton and Wilson hospitals.  (Id. ¶ 20).  Each sign was approximately six feet tall, boasting a large "United Health Services" seal and the hospital's name, followed by subscript stating "United Health Services Hospitals" and "A Member of the UHS Health Care System."  (Doc. 153-3 at 46, 66-67).  United Health Services registered its domain name—www.uhs.net—in July 1997.  (Doc. 153 ¶ 25).

United Health Services adopted a new system wide brand in 1997.  (See Doc. 155 ¶ 5; see also Doc. 161-5 ¶ 5).  The rebranding initiative aimed to create a unified corporate identity, structured around the following logo:



(See Doc. 157, Ex. 47).  The branding guidelines issued to all United Health Services entities stated: "There should be no variation in the logo.  This will maintain clarity and consistency throughout our system."  (Id. at 4).

Christina Boyd ("Boyd"), Vice President of Community Relations for the United Health Services system, testified that system entities were required to and did comply with the new branding policy, except for isolated incidents of "rogue" advertisements by individual system entities.  (Doc. 155 ¶ 7; Doc. 161-5 ¶ 7).  The record reflects that from 1997 until 2010, United Health Services displayed the new logo on its website and included the logo in weekly employee newsletters, system periodicals, annual reports, and advertisements.  (Doc. 163, Ex. A, UHSHI 30(b)(6) Dep. (Boyd) 70:15-76:19, 79:5-82:18, 96:12-15, 99:4-102:23, 108:22-110:7 (Jan. 14, 2016)).

United Health Services began a new rebranding effort in 2009.  (Doc. 155 ¶ 8; Doc. 161-5 ¶ 8).  The 2009 rebranding initiative was led by Boyd and a centralized steering committee—called Integration, Too!—which included members of each subsidiary's executive team as well as certain business unit leaders.  (Doc. 155 ¶ 8; Doc. 161-5 ¶ 8; see also Doc. 157, Ex. 19, UHSHI 30(b)(6) Dep. (Carrigg) 35:25-37:11 (Jan. 15, 2016)).  On August 20, 2009, the Integration, Too! committee agreed to adopt the following system wide logo:



(Doc. 155 ¶ 8; Doc. 161-1 ¶ 8; see also Doc. 157, Ex. 29 at 6).  To achieve a unified corporate identity, Integration, Too! also decided to rename each system entity to include the "UHS" title followed by a specific location or services delimiter, i.e., "UHS Delaware Valley Hospital."  (Doc. 157, Ex. 35 at 3).  United Health Services introduced "UHS" and the stylized logo as its "new name" in June 2010.  (Id. Ex. 61 at 2).

UHS Delaware instituted this action with the filing of a complaint (Doc. 1) on March 16, 2012, subsequently filing an amended complaint (Doc. 9) on April 26, 2012, and a second amended complaint (Doc. 14-3) on June 6, 2012.  UHS Delaware asserts the following claims: federal trademark infringement of the '433 mark (Count I) and the '663 mark (Count III) under 15 U.S.C. § 1114; federal unfair competition as to the '433 mark (Count II) and the '663 mark (Count IV) under 15 U.S.C. § 1125(a) and common law; state law infringement of the '663 mark under 54 Pa. Stat. & Cons. Stat. Ann. § 1123 (Count V); and contributory infringement under federal and state statutory law and common law against United Health Services alone (Count VI).  In the alternative, UHS Delaware seeks a declaration of the parties' respective rights pursuant to 28 U.S.C. § 2201 (Count VII).

Defendants filed individual answers and affirmative defenses (Docs. 114-20) on March 3, 2015.  Among other defenses, each defendant asserts that it has senior rights to the "UHS" mark against UHS Delaware in New York state.  (See id.) United Health Services separately asserted counterclaims against UHS Delaware, seeking cancellation of the '433 and '663 marks.  (Doc. 114).  The court dismissed United Health Services' counterclaims with leave to amend by memorandum and

6

order dated November 19, 2015.  <u>UHS of Delaware, Inc.</u>, 2015 WL 7294454.  United

Health Services elected not to amend its counterclaims.

Following a period of discovery, the parties filed the instant cross-motions

(Docs. 150-51) for summary judgment, together with supporting papers.[4]  The

motions are fully briefed and ripe for disposition.

## II.    <u>Standard of Review</u>

Through summary adjudication, the court may dispose of those claims that

do not present a "genuine dispute as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of

proof tasks the non-moving party to come forth with "affirmative evidence, beyond

the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of</u>

---

[4] United Health Services' responsive statement of facts (Doc. 161-5), as docketed, discontinues at page 20, halfway through paragraph 5.  The original filing provided to the court includes all 42 pages and 42 paragraphs of the document.  For ease of reference, the court will cite to the docketed version of the statement of facts as though it contains the full document.  In addition to providing responses to each of UHS Delaware's statements of fact, United Health Services' responsive statement includes 26 paragraphs styled as "Additional Undisputed Facts that Warrant Denial of Plaintiff's Motion."  Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes this filing, and United Health Services did not request leave of court therefor.  The court will not consider the additional paragraphs of United Health Services' statement as same fail to conform to our procedural rules.

UHS Delaware also runs afoul of Local Rule 56.1.  Its counterstatement of facts (Doc. 163-1) in opposition to defendants' motion does not contain enumerated paragraphs "responding to the numbered paragraphs set forth in the statement" provided by the moving party.  LOCAL RULE OF COURT 56.1.  Rather, UHS Delaware asserts broadly in three opening paragraphs that it disputes paragraphs 15 and 16 of United Health Services' statement (concerning defendants' alleged continuous use of the "UHS" mark) and then provides supplemental paragraphs supporting those denials.  (<u>See</u> Doc. 163-1).  Consistent with Local Rule 56.1, with the exception of paragraphs 15 and 16, the court deems United Health Services' statement of facts to be admitted.

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Fed. Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 2014).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  Fed. R. Civ. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   Discussion

Claims for trademark infringement and unfair competition share the same essential elements under both the Lanham Act and Pennsylvania law.  See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); Harp v. Rahme, 984 F. Supp. 2d 398, 409-10 (E.D. Pa. 2013).  To prevail on either claim, a plaintiff must establish that (1) the marks in dispute are valid and legally protectable; (2) plaintiff owns the marks; and (3) defendant's use of a similar mark generates "a likelihood of confusion."  A&H Sportswear, 237 F.3d at 210.  The court will address threshold issues of validity and ownership before delving into the more

nuanced likelihood of confusion inquiry and United Health Services' junior user defense.

## A.     UHS Delaware's Motion: Ownership and Validity of the Marks

United Health Services does not challenge UHS Delaware's ownership of the '433 and '663 marks.  (Doc. 155 ¶ 1; Doc. 161-5 ¶ 1).  Nor does it dispute that the marks are valid and legally protectable.  (Doc. 155 ¶ 1; Doc. 161-5 ¶ 1).  Instead, United Health Services remonstrates throughout its papers that UHS Delaware does not *use* either mark.  (<u>See</u> Doc. 161-1 at 2-3, 14-15, 19).[5]  United Health Services accordingly denies UHS Delaware's factual assertions concerning advertising and promotional use of the marks.  (<u>See</u> Doc. 161-5 ¶¶ 2-3).  It further asserts that UHS Delaware has not produced any evidence proving that its associated facilities are licensed users of the '433 and '663 marks.  (<u>See</u> Doc. 161-1 at 3).  This preliminary issue permeates many of United Health Services' Rule 56 arguments.

The Lanham Act extends its protections to registered marks in legitimate use by a registrant's "related companies."  15 U.S.C. § 1055.  When a related company uses a mark with a registrant's permission, that use "shall inure to the benefit of the registrant," so long as the registrant maintains sufficient control over the licensee's use.  <u>Id.</u>  Authorized use by a related party will maintain a trademark owner's rights even when the *only* use of the mark is by the related party.  3 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION §§ 18:45.50, 18:46 (4th ed. 2016).  Trademark

---

[5] United Health Services' brief in opposition to UHS Delaware's motion spans two docket entries.  (Docs. 161-1 to -2).  The same is true of UHS Delaware's opposition brief.  (Docs. 163-2 to -3).  For ease of reference, citations to these briefs are to the first docket entry only.

licensing agreements between a registrant and related parties, whether written or implied, will avail the registrant of the Act's protections.  See Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 824 (3d Cir. 2006).

UHS Delaware need not establish its own use of the trademarks to defend them against infringement.  It is sufficient to establish use by its licensee affiliates and subsidiaries.  UHS Delaware has submitted the affidavit of its associate general counsel attesting that Universal's subsidiaries use both the '433 and '663 marks with permission from UHS Delaware, pursuant to its healthcare management contracts with the subsidiary entities.  (Doc. 170, Ex. AA ¶¶ 2-3).  This authorized use of the '433 and '663 marks by parent and subsidiary corporations of UHS Delaware inures to its benefit as owner of the marks.  Consequently, the court rejects United Health Services' assertion that UHS Delaware cannot establish "use" of the marks.

###    B.    UHS Delaware's Motion: Likelihood of Confusion

To prove likelihood of confusion, a plaintiff must demonstrate that, after viewing both marks, consumers "would probably assume" that the products or services bearing the marks share the same source.  Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001) (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978), superseded on other grounds by Shire US Inc. v. Barr Labs., 329 F.3d 348, 352 n.10 (3d Cir. 2003)), aff'g 104 F. Supp. 2d 427 (D.N.J. 2000).  Courts within the Third Circuit Court of Appeals apply a familiar, nonexhaustive list of factors (the "Lapp factors") to determine whether there is a likelihood of confusion between competing marks:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; [and] (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983) (citing Scott Paper Co., 589 F.2d at 1229). The inquiry is qualitative: no single factor is dispositive, and not all factors are relevant in every case. See Checkpoint Sys., 269 F.3d at 280. As the factors illustrate, likelihood of confusion is a decidedly fact-intensive issue. Courts have thus cautioned that "summary judgment for either party is unlikely, absent a particularly one-sided factual record." 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F. Supp. 2d 273, 285 (D.N.J. 2006); see also Country Floors, Inc. v. P'ship Composed of Gepner & Ford, 930 F.2d 1056, 1062-63 (3d Cir. 1991). We address the salient Lapp factors *seriatim*.

### 1. *Factor 1: Similarity of Marks*

The Third Circuit Court of Appeals ranks similarity of marks as "the single most important" of the ten Lapp factors. A&H Sportswear, 237 F.3d at 216 (citing Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 476 (3d Cir. 1994)). Its importance, however, does not render the factor dispositive. See Checkpoint Sys.,

269 F.3d at 281.  Rather than a "side-by-side comparison," the court must endeavor to "move into the mind of the roving consumer" and ask whether the consumer— encountering one of the two marks in isolation with only general recollection of the other—would likely confuse the two.  Id.; A&H Sportswear, 237 F.3d at 216.  A court measuring similarity must "compare the appearance, sound and meaning of the marks."  Checkpoint Sys., 269 F.3d at 281 (citation omitted).

In considering a mark's appearance, courts look to "visual characteristics such as the layout and format of lettering."  Harp, 984 F. Supp. 2d at 411-12 (citing A&H Sportswear, 237 F.3d at 217).  Courts measure the "sound" and "auditory impressions" of a mark by examining the number of words and syllables employed and the different (or similar) uses of those words and syllables.  See id.  "Meaning" is determined by assessing whether the combination of words in each mark offers "a different denotative or connotative meaning."  Id. at 413.

Defendants' UHS logo bears resemblance to UHS Delaware's '433 word mark and '663 stylized mark against all sight, sound, and meaning metrics.  The marks contain the same three capitalized letters—UHS—separated by neither punctuation nor spacing and accompanied by no other text.  Each mark differs marginally in style: UHS Delaware's stylized mark comprises three hollowed-out and rounded letters with no attendant graphic, while United Health Services' logo displays a solid, serif font accompanied by a small leaf graphic in the upper left region of its letter "U."  The marks are otherwise indistinct.  Read aloud, the marks produce identical auditory impressions.  As a result of their simplicity, neither mark evokes a unique denotative or connotative meaning in isolation.

The record evidence concerning mark similarity is undisputed.  There exists near identity between the parties' marks.  United Health Services effectively concedes as much in its briefing, rejoining only that "[s]imilarity in name is only the beginning of the analysis."  (Doc. 161-1 at 11-12).  The first <u>Lapp</u> factor clearly favors UHS Delaware.[6]

### 2.    *Factor 2: Strength of the Owner's Mark*

The strength of a mark is determined by both "distinctiveness or conceptual strength" and "commercial strength."  <u>Checkpoint Sys.</u>, 269 F.3d at 282.  The first prong assesses "inherent features" of the mark.  <u>Freedom Card, Inc. v. JPMorgan Chase & Co.</u>, 432 F.3d 463, 472 (3d Cir. 2005).  The second examines any "factual evidence of marketplace recognition."  <u>Id.</u>  The parties vigorously debate the strength of UHS Delaware's marks against both criteria.

### a.    **Conceptual Strength**

Courts evaluate conceptual strength on a four-part spectrum, ranging from strongest to weakest: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic.  <u>A&H Sportswear</u>, 237 F.3d at 221.  The strongest marks—designated arbitrary or fanciful—generally do not describe or imply anything about their associated product.  <u>See id.</u>  Arbitrary marks are "virtually indistinguishable" from

---

[6] UHS Delaware maintains that, because the parties are "direct competitors," the court need look no further than the first <u>Lapp</u> factor in measuring likelihood of confusion.  UHS Delaware is correct insofar as the Third Circuit has held that when "products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves."  <u>A&H Sportswear</u>, 237 F.3d at 214.  Nonetheless, as discussed *infra*, genuine disputes persist for trial concerning the degree of overlap, if any, between plaintiff's and defendants' respective target markets.

suggestive marks, except that the latter may "suggest a quality or ingredient of goods" and require an element of consumer "imagination, thought, or perception." Checkpoint Sys., 269 F.3d at 282 (quoting Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 292 n.18 (3d Cir. 1991)).  Descriptive marks, by contrast, more directly convey an idea of product ingredients, qualities, or characteristics.  A&H Sportswear, 237 F.3d at 222 (citation omitted).  Marks in the generic category are the weakest and function as a "common descriptive name of a product class."  Id.

Registered and incontestable trademarks are presumptively distinctive.  See CSC Holdings, LLC v. Optimum Networks, Inc., 731 F. Supp. 2d 400, 408 n.3 (D.N.J. 2010); First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc., 896 F. Supp. 456, 461 (E.D. Pa. 1995); but see Fancaster, Inc. v. Comcast Corp., 832 F. Supp. 2d 380, 416 (D.N.J. 2011).  However, a mark's incontestable status does not preclude a challenge of its strength.  First Keystone, 896 F. Supp. at 461.  Against a proven senior user of the mark, incontestability is ultimately immaterial.  See Marshak v. Treadwell, 240 F.3d 184, 198 n.10 (3d Cir. 2001).

UHS Delaware maintains that its marks are conceptually strong independent of incontestability.  (See Doc. 155-2 at 19-20).  It asserts that the marks are entitled to the highest level of trademark protection as "arbitrary and fanciful" marks because "there is no direct connection between 'UHS' and the services provided under the mark."  (Id. at 20).  Defendants do not dispute this proposition.  (See Doc. 161-1 at 12-17).  Defendants instead rejoin that any conceptual strength the marks may have in isolation is diluted by widespread third-party use of the "UHS" logo in both medical services markets and beyond.  (See id.)

14

Use or association of a mark with many different products in similar markets weakens the mark's conceptual strength.  See A&H Sportswear, 237 F.3d at 223. Multiple uses in a narrow, relevant market are particularly probative, but extensive use in "other markets" may also have a significant dilutive effect.  Id.  In A&H Sportswear, for example, the Third Circuit rejected a district court's finding that extensive use of the term "MIRACLE" in hosiery, children's wear, ready-to-wear, and maternity wear categories did not undermine the strength of the MIRACLE mark in the swimwear market.  Id. at 223-24 (citing Sun Banks of Fla., Inc. v. Sun Fed. Savings & Loan Ass'n, 651 F.2d 311 (5th Cir. 1981)).

United Health Services identifies multiple third-party users of nearly identical marks in related healthcare markets.  Universal Hospital Services, Inc., is the registered owner of the "UHS" word mark for medical equipment rentals.  (Doc. 161, Ex. 40 at 1).  Three major healthcare service providers employ nearly identical stylized marks: UHS Surgical Services (a division of Universal Hospital Services, Inc.); Unified Health Services; and Union Health Services, Inc.  (Id. Ex. 42 at 2-4). At least ten large universities adopt "UHS" as a mark for their school's healthcare services providers.  (Id. Ex. 41).

UHS Delaware remonstrates that defendants' list of third-party users lacks sufficient geographic and industry context and that defendants have failed to prove "enough" third-party uses of the mark.  (Doc. 170-10 at 10-11).  The court disagrees. In resolving UHS Delaware's motion, we construe the evidence and all favorable inferences drawn therefrom in United Health Services' favor.  Viewed through this lens, the court finds that the strength of UHS Delaware's marks is limited by

abundant employ of "UHS" acronyms throughout the healthcare industry.  (See

Doc. 161, Exs. 40-42).

### b.    Commercial Strength

When measuring commercial strength, courts consider advertising

expenditures, sales volume, and purchasing trends.  Harp, 984 F. Supp. 2d at 415.

These factual indicators serve as proxies to test the likelihood and extent of market

recognition.  See id.; see also A&H Sportswear, 237 F.3d at 224.  The court must

consider the extent of the registrant's efforts to promote and fortify the mark's

"commercial presence" through the prism of this evidence.  See Checkpoint Sys.,

104 F. Supp. 2d at 458.

UHS Delaware highlights its advertising expenditures and sales volume as

evidence of commercial strength.  (See Doc. 155-2 at 20-21).  It asserts that UHS

Delaware has spent millions of dollars in advertising and promotion of its services

over the past two decades.  (See id. at 20).  UHS Delaware further observes that its

parent corporation, Universal, is a Fortune 500 company with an executive team

that is regularly recognized for industry accomplishments.  (Id. at 21).

Our inquiry concerns strength of the *mark*, not overall strength of its

registered owner.  UHS Delaware touts its advertising expenditures broadly but

offers no proof that those expenditures involved, concerned, or were an attempt to

promote the UHS marks.  And UHS Delaware offers no supplemental evidence—

such as consumer perception surveys or focus groups establishing actual market

recognition—to support its commercial strength argument.  Cf. Checkpoint Sys.,

104 F. Supp. 2d at 460.  As the Third Circuit has noted, even evidence of significant

16

expenditures in connection with a mark "does not automatically translate into consumer recognition." A&H Sportswear, 237 F.3d at 224.

Despite the presumptive distinction of UHS Delaware's incontestable marks, the Rule 56 record contains a dearth of evidence substantiating their commercial strength. The dilutive effect of third-party usage clearly undermines the marks' overall strength. Consequently, this factor is neutral.

### 3.   *Factor 3: Care and Sophistication of Purchasers*

The third Lapp factor acknowledges that likelihood of confusion decreases when consumers exercise greater care in making purchasing decisions. Checkpoint Sys., 269 F.3d at 284. When a product is expensive or complex, or the buyer class is composed of professional purchasers, the likelihood of confusion decreases. Id. (quoting Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 204 (3d Cir. 1995)). Likewise, the more important a product is perceived to be, the more care a consumer is presumed to exercise. Id. *Per contra*, lesser degrees of care attend inexpensive products and services. Id. When a purchasing class is "mixed"— composed of both average consumers and professional consumers—courts apply the standard of care of "the least sophisticated consumer." Versa Prods. Co., 50 F.3d at 205 (quoting Ford Motor Co., 930 F.2d at 293).

The record establishes that the customer base is in fact "mixed": UHS Delaware's senior vice president of business development testified that their base includes healthcare industry members, medical and mental health practitioners, professional referral sources, and ordinary patients. (Doc. 157, Ex. 10, Carothers Evans Dep. 39:14-40:9, 74:19-75:3 (Jan. 14, 2016)). Such a widely varied consumer

class compels application of the least sophisticated consumer standard of care.

Versa Prods. Co., 50 F.3d at 205.  However, in adopting this standard, we expressly

reject UHS Delaware's *ipse dixit* assertion that the "least sophisticated consumer"

consumer is necessarily "unsophisticated."  The record contains no support for the

assumption that an ordinary patient exercises little or no care in selecting medical

services.  To the contrary, such important decisions doubtless trigger a heightened

standard of care in the ordinary consumer.  This factor favors United Health

Services, albeit to a limited extent.

4.    ***Factors 4 and 6: The Length of Use Without Actual Confusion
      and Any Incidents of Actual Confusion***

The fourth and sixth Lapp factors significantly overlap, and courts

routinely consider them together.  Both factors task the court to consider whether

a "pattern of confusion" has emerged in the relevant product or service market.

Scott Paper Co., 589 F.2d at 1231.  This inquiry is not concerned with "isolated

and idiosyncratic" examples of confusion between products or services.  A&H

Sportswear, 237 F.3d at 227.  Instances of confusion of limited scope may be

"dismissed as inconsequential or *de minimis*."  4 MCCARTHY, *supra*, at § 23:14.  The

fourth factor acknowledges that marks which have coexisted without confusion for

years are less likely to cause consumer confusion in the future.  Harp, 984 F. Supp.

2d at 416 (quoting Versa Prods. Co., 50 F.3d at 204-05).  This inference strengthens

the longer the challenged marks have been in use.  Versa Prods. Co., 50 F.3d at 205.

UHS Delaware relies on the following as evidence of actual confusion:

- An email dated May 18, 2010 wherein Boyd observes to a colleague that "there are a few UHSs out there" and "we sometimes get e-mails and inquiries meant for them."  (Doc. 157, Ex. 41).

- Boyd's testimony concerning a CNBC broadcast in November 2010 in which defendants' logo was displayed on screen while plaintiff's chief executive officer was speaking about Universal.  (See Boyd 30(b)(6) Dep. 141:14-142:12).

- Testimony of three of defendants' officers that both UHS Delaware and United Health Services employees received telephone calls and other communications meant for the other.  (Doc. 155 ¶ 13; Doc. 155-2 at 18-19).

- Boyd's testimony that, in 2013, a subordinate reported to her that a news report had run in Binghamton, New York, wherein a reporter erroneously referred to a United Health Services facility as a Universal facility in both online and on-air stories.  (Boyd 30(b)(6) Dep. 130:8-131:11).

- A "Tweet" dated April 12, 2015, wherein a Twitter user included United Health Services' Twitter handle when referencing Universal.[7]  (Doc. 157, Ex. 44).

- Testimony of a Universal employee concerning a misdirected email received from Healthgrades on March 12, 2015, regarding a potential award to defendants' Wilson hospital.  (Doc. 157, Ex. 15, Mary Ann Ninnis Dep. 88:11-89:22 (Jan. 14, 2016)).

- An April 2, 2016 billing dispute letter addressed to "United Health Services" but mailed to both United Health Services and to Universal. (Doc. 170, Ex. AA at 41).

---

[7] UHS Delaware refers to a second Tweet, purportedly dated July 26, 2013, which misidentified Universal's chief executive officer as being associated with United Health Services.  (See Doc. 155-2 at 19 (citing Doc. 157, Exs. 44, 46)).  The cited exhibits are duplicate copies of the April 12, 2015 Tweet.  (See Docs. 157, Exs. 44, 46).  Hence, the court does not consider the alleged but unproven July 26, 2013 Tweet.

United Health Services argues that this evidence is both inadmissible and irrelevant. (Doc. 161 ¶ 13; Doc. 161-1 at 20-21). The court addresses United Health Services' evidentiary objection first.

Historically, accounts of customer conversations with subordinate employees have been met with successful hearsay objections. See, e.g., Versa Prods. Co., 50 F.3d at 212. However, in Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2000), the Third Circuit changed course in exploring objections similar to those lodged by defendants.[8] The circuit panel observed that the first level of hearsay—customer statements to employees evincing confusion—are not hearsay because they are submitted for their falsity rather than their truth. Id. at 719. It is the second level of hearsay—statements by employees to the deponent describing telephone calls—that must satisfy an exception to the hearsay rule. See id. Even if the second-level statement fails to meet an exception, a witness may acknowledge receipt of subordinate reports of confusion. Id.

UHS Delaware relies exclusively on the court's first-level hearsay analysis without identifying an exception for admitting the second-level hearsay statements. UHS Delaware posits that Kos Pharmaceuticals authorizes blanket admission of any and all confusion evidence based on its purported falsity. (See Doc. 170-10 at 13-14). This contention misreads the Third Circuit's decision. Absent an exception authorizing admission of the second-level statements, testimony concerning the *content* of subordinate conversations with customers is inadmissible hearsay. See

---

[8] The court offered its analysis in a preliminary injunction posture, where the Rules of Evidence are relaxed, but noted that its rationale would apply with equal force at trial and in the Rule 56 context. Kos Pharms., 369 F.3d at 719.

<u>Kos Pharms.</u>, 357 F.3d at 719.  Officers may permissibly testify to the fact that they received reports of confusion from their employees, but the hearsay rule prohibits any substantive recount of underlying conversations.[9]  <u>Id.</u>

Assuming admissibility *arguendo*, the record evidence falls short of establishing a pattern of actual confusion.  UHS Delaware asserts that instances of confusion began after United Health Services' rebranding rollout in June 2010.  (Doc. 155 ¶ 13).  To support this proposition, UHS Delaware cites to Boyd's email acknowledging that "we sometimes get e-mails and inquiries meant for" entities with similar names; the email is dated May 18, 2010, a month *before* implementation of the new logo.  (<u>See</u> Doc. 157, Ex. 41 at 2).  As for the CNBC interview associating defendants' logo with Universal's CEO, that error may just as likely have derived from the incredible irony that both companies' CEOs shared the name "Alan Miller."  (<u>See</u> Boyd 30(b)(6) Dep. 141:14-142:12).  The cited evidence simply does not have the dispositive force suggested by UHS Delaware.

Moreover, instances of confusion cited by UHS Delaware are few and far between, representing nothing more than "isolated and idiosyncratic" incidents.

---

[9] The excluded testimony would not tip the balance in UHS Delaware's favor.  No reported conversation establishes context, timing, or other information which might evince actual confusion from the respective marks.  Anecdotal evidence of misdirected telephone calls or letters is usually insufficient to prove actual confusion, particularly when the communications are relayed by interested employees and do not concern the purchase of products or services.  <u>See</u>, <u>e.g.</u>, <u>Scott Paper</u>, 589 F.2d at 1231; <u>Inc. Publ'g Corp. v. Manhattan Magazine, Inc.</u>, 616 F. Supp. 370, 388-89 (S.D.N.Y. 1985), <u>aff'd without op.</u>, 788 F.2d 3 (2d Cir. 1986).  We are cautioned to view such employee-provided reports "with skepticism," as they often "tend[]to be biased or self-serving."  <u>Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City</u>, 383 F.3d 110, 122 (3d Cir. 2004) (citing <u>Checkpoint Sys.</u>, 269 F.3d at 298; <u>A&H Sportswear</u>, 237 F.3d at 227).

A&H Sportswear, 237 F.3d at 227.  As purported concrete evidence of confusion,

UHS Delaware identifies a single Tweet, an error in a local news report, a

misdirected email from an industry professional, and one billing dispute letter.

Measured against more than six years' use of similar marks, the incidents identified

by UHS Delaware are negligible.

The court cannot find, at this juncture, that UHS Delaware has proven a

pattern of confusion as a matter of law.  The actual confusion factor weighs in favor

of United Health Services.

### 5.    *Factor 5: Intent of the Defendant*

The intent factor examines whether the defendant actually intended to

confuse consumers by adopting a mark resembling the plaintiff's mark.  See A&H

Sportswear, 237 F.3d at 225-26 (citing Versa Prods. Co., 50 F.3d at 205-06).  The

mark owner must demonstrate an intent to *confuse*; an "intent to copy, without

more," will not suffice.  Id.  Mere carelessness, as opposed to deliberate intent,

will not resolve this factor in the owner's favor.  Id. at 232-33.  Similarly, "mere

knowledge" of a competing mark is insufficient to prove intent to confuse.

Fancaster, 832 F. Supp. 2d at 418.

UHS Delaware avers that United Health Services adopted the new marks

with an intent to trade on Universal's goodwill.  As support, UHS Delaware cites

to: (1) Boyd's May 18, 2010 email and (2) evidence that defendants' officers receive

trade journals and publications in which Universal advertises.  (Doc. 155-2 at 22-23).

The cited evidence establishes nothing more than a potential awareness of

Universal's presence in the general healthcare marketplace. Universal's vice president of advertising conceded that any suggestion of defendants' intentions is pure speculation. (See Ninnis Dep. 75:4-77-16). Plaintiff cannot divine whether defendants purposefully sought to trade on Universal's good will. (Id.) In fact, UHS Delaware acknowledges that United Health Services' stated objective was, at least in part, to distinguish itself from competitors such as United Healthcare and Universal Health System. (Doc. 155-2 at 23).

There is no evidence of bad faith on the part of United Health Services, and this factor weighs against UHS Delaware.

6. ***Factors 7 and 8: Evidence of Shared Marketing and Advertising Channels and Targets***

The seventh and eighth Lapp factors assess the existence and degree of overlap among the parties' trade channels and target markets. When parties target their sales efforts to the same consumer base, the likelihood of confusion increases. Checkpoint Sys., 269 F.3d at 289. Similarly, although "perfect parallelism will rarely be found," A&H Sportswear, 237 F.3d at 225, significant overlap between marketing and advertising channels correlates to greater likelihood of confusion. Checkpoint Sys., 269 F.3d at 288-89 (quoting Axciom Corp. v. Axiom, Inc., 27 F. Supp. 2d 478, 502 (D. Del. 1998)). To this end, we must consider the class of customers to whom goods and services are marketed, the manner in which those products are advertised, and the channels through which they are sold. See id. Each of these inquiries is "intensely factual." Id. at 289.

There is no genuine dispute concerning overlap in *manner* of advertisement. Both systems advertise hospital and healthcare services through print, online, and television media.  (Doc. 155 ¶¶ 2, 12; <u>see</u> Doc. 161-5 ¶¶ 2, 12).  But the parties agree on little else.  UHS Delaware asserts that the parties' target markets and channels of communication are "virtually identical."  (Doc. 155-2 at 24-25).  A UHS Delaware witness reported that its affiliates run articles in national publications such as the *New York Times*, the *Wall Street Journal*, and *Fortune Magazine* which ostensibly reach New York residents.  (Ninnis Dep. 104:8-105:4).  However, its employees noted that, beyond the incidental reach of national, subscription-based media, neither Universal nor its affiliates undertake specific efforts to "target New York consumers."  (<u>See</u> Doc. 161, Ex. 2, Margaret Care Dep. 81:17-82:20, 85:10-18 (Jan. 12, 2016); <u>see</u> <u>also</u> Ninnis Dep. 69:18-70:11).

As it concerns UHS Delaware's customer base, the record reflects that UHS Delaware's affiliated behavioral health facilities in Pennsylvania have treated New York residents.  Those residents comprise less than one percent of the patient pool, with a singular exception.  (Doc. 161-5 ¶ 2 at 11-12).  In 2014, four percent of patients treated on an outpatient basis at Foundations Behavioral Health, a UHS Delaware affiliate located in Doylestown, Pennsylvania, were New York residents.  (<u>Id.</u>)  A corporate representative for UHS Delaware testified that Foundations operates a "high-functioning acute care residential unit for adolescents" which has a "very targeted" referral program relationship with certain New York state agencies.  (Evans Dep. 41:16-42:13, 45:7-18).

Witnesses testified that, although UHS Delaware does not have a brick and mortar presence in New York state where United Health Services operates, its affiliates serve patients from across the country, including New York residents. (Doc. 157, Ex. 9, Frank Lopez Dep. 22:5-23, 28:6-18, 53:17-54:3, 105:22-107:13 (Jan. 15, 2016); Evans Dep. 32:2-33:4, 38:19-44:3). UHS Delaware notes that "snowbirds"— residents of New York who travel south for the winter months—visit its Wellington Regional Medical Center ("Wellington") in West Palm Beach, Florida, as needed on holiday. (Lopez Dep. 22:5-23). In addition, its affiliates in Las Vegas "quite often see[] individuals that reside in New York . . . because of the tourism traffic." (Id. 106:3-9). UHS Delaware also identifies one full-time New York resident who travels to Wellington from New York for treatment with a nationally-renowned physician. (See id. 28:6-25).

UHS Delaware's assertion that its affiliates share "virtually identical" target markets and customer bases with United Health Services is presently unsupported. The court cannot ascertain from the record whether the cited examples of overlap derive from UHS Delaware's marketing efforts and consumer brand recognition, or the sheer happenstance of New York residents requiring hospital services on vacation. As a result, the seventh and eighth factors are largely a wash. The jury, not the court, must weigh the parties' opposing characterizations of their respective advertising efforts and target markets. We cannot resolve either factor in favor of UHS Delaware at this juncture.

### 7.   *Factor 9: Relationship of the Goods in the Minds of Consumers*

The ninth factor tasks the court to consider whether the marks and their associated services are "similar enough that a consumer could assume they were offered by the same source." <u>Kos Pharms.</u>, 369 F.3d at 723 (quoting <u>Fisons</u>, 30 F.3d at 481).  The court has already determined that the marks are quite similar and may confuse average consumers.  Hence, our inquiry is simply whether the services provided under those marks are so similar that a consumer "might . . . reasonably conclude that one company would offer both." <u>Checkpoint Sys.</u>, 269 F.3d at 286 (quoting <u>Fisons</u>, 30 F.3d at 481).

United Health Services concedes that both health systems offer a variety of hospital and healthcare services, including, *inter alia*, emergency medicine, general surgery, long-term care, physical therapy and rehabilitation, alcohol and substance abuse treatment, and psychiatric services.  (Doc. 153 ¶¶ 5-14; Doc. 155-2 at 26; <u>see also</u> Doc. 157, Ex. 27 at 2-12).  United Health Services posits that a "professional" purchaser of healthcare services would not mistakenly believe that the services emanate from the same source.  (Doc. 161-1 at 25).  However, the ninth <u>Lapp</u> factor does not address purchaser sophistication; rather, the question is simply "how similar, or closely related, the products are." <u>Kos Pharms.</u>, 369 F.3d at 722-23. The answer is "very similar."  Consequently, this factor favors UHS Delaware.

### 8.   *Factor 10: Likelihood of Expansion*

The tenth factor considers "other facts" from which a consumer might expect that the trademark owner, through expansion or otherwise, is affiliated with the

alleged infringer.  See Fisons, 30 F.3d at 480.  The inquiry is "highly context-dependent."  Kos Pharms., 369 F.3d at 724.  Courts should consider "the nature of the products or the relevant market" and "the practices of other companies in the relevant fields."  Id.

UHS Delaware summarily claims that the average consumer "could reasonably expect" UHS Delaware to be the source of defendants' services in New York.  (Doc. 155-2 at 26-27).  United Health Services answers that neither UHS Delaware nor any of its affiliates have plans to expand to New York, nor could they: New York law prohibits for-profit corporations like UHS Delaware and Universal from operating healthcare facilities in the state.  (Doc. 161-1 at 26; Lopez Dep. 124:3-20, 125:23-126:1).  There is no record indication that consumers would be aware of this legal nuance.  Accordingly, the court finds that this factor is neutral.

### 9.   *Balancing the Factors*

UHS Delaware has not made the requisite showing to obtain judgment as a matter of law.  Mark similarity is the only compelling factor signaling a likelihood of confusion.  The ninth factor—similarity of services—appears to be undisputed and favors UHS Delaware, but absent contextual evidence that the parties operate in overlapping spheres, the weight of this factor is minimal.

By virtue of their inherent distinctiveness, the UHS marks are, in isolation, conceptually strong.  That inceptive strength is diluted by multiple similar uses within related markets.  The remaining factors are either neutral or favor United Health Services: UHS Delaware offers no evidence substantiating the professed commercial strength of its marks, nor has it proven that United Health Services

27

intended or has achieved consumer confusion.  UHS Delaware's failure to substantiate the weighted balance of the <u>Lapp</u> factors is fatal to its Rule 56 pursuit.  The court will deny UHS Delaware's motion for summary judgment.[10]

### C.   United Health Services' Motion: Junior User Defense

Federal registration of a trademark does not extinguish existing rights that other users have acquired under common law.  <u>See</u> 5 MCCARTHY, *supra* at § 26:53; <u>see</u> <u>also</u> 15 U.S.C. §§ 1115(b)(5), 1065.  Even when a mark achieves incontestable status, senior users of the mark enjoy an exception to incontestability and a defense to an infringement action.  <u>Marshak</u>, 240 F.3d at 198 n.10; 5 MCCARTHY, *supra* at § 26:53.  To sustain this defense, a party charged with infringement must prove that its own mark "has been continuously used by such party or those in privity with him from a date prior to . . . the registration of the mark" in question.  15 U.S.C. § 1115(b)(5).  Prior use protection extends only to the "areas where the prior user has established a market for its goods."  <u>Nat. Footwear Ltd. v. Hart, Schaffner</u> <u>& Marx</u>, 760 F.2d 1383, 1395 (3d Cir.), <u>cert. denied</u>, 474 U.S. 920 (1985).

United Health Services maintains that its "UHS" mark has been in continuous use in the state of New York since at least 1982.  (Doc. 152 at 12-13). John Carrigg ("Carrigg"), executive vice president and chief operating officer of

---

[10] The court concludes *infra* that disputes of fact remain as to United Health Services' junior user defense and will deny UHS Delaware's request for summary judgment on that particular defense on the merits.  The court declines to address UHS Delaware's motion on United Health Services' remaining affirmative defenses in light of the conclusory nature of UHS Delaware's argument.  The court does not address UHS Delaware's request for judgment on its contributory infringement claim against United Health Services as that claim is fully derivative of its underlying substantive charges.

both United Health Services and United Health Services Hospitals, Inc., explains

that, in 1981, the Binghamton and Wilson hospitals merged and became "known

in the community as part of UHSI." (Doc. 153, Ex. A ¶ 3).  Carrigg concedes that

"UHSI was not the only name used to describe the health care system over the

years," observing that it has been referred to as both "United Health Services,

Inc.," and by "the UHS name."  (Id.)

The record establishes that defendants used "UHS" in a handful of internal

documents, beginning with a 1982 employee newsletter titled "UHS Life."  (Doc. 153

¶ 17).  Defendants distributed subsequent versions of the newsletter, retitled "The

UHS News," in May 1983, July/August 1983, November 1984, December 1984,

March 1985, Fall/Winter 1989, and Summer 1990.  (Id.)  "UHS" appears in a 1990

annual report, a 1991 pamphlet advertising childbirth classes to the public, a 1991

"Report to the Community," and a "1991 Annual Review."  (Id. ¶¶ 18-19).

Defendants identify several newspaper clippings from the 1980s and early 1990s

that reflect third-party use of the term "UHS" during that time.  (See id. ¶ 22).

In 1990 or 1991, the Binghamton and Wilson hospitals erected "monument

signs" at their respective entrances.  (Id. ¶ 20).  Both signs display a large "United

Health Services" seal, followed by the name of each hospital.  The seal and hospital

name dominate each sign but are followed by subscript reading: "United Health

Services Hospitals" and "A Member of the UHS Health Care System."  (See Doc.

153-3 at 46, 66-67).  The monument signs were removed in 2012 following the 2010

rebranding initiative.  (Doc. 153 ¶ 20).  To corroborate continued use throughout the

mid-1990s, defendants point to 1993 and 1995 community service reports and a

March 1997 "Health Care 100" listing, each referencing the "UHS Health Care System." (Id. ¶¶ 23-24). Defendants have used their registered domain name—www.uhs.net—since 1997. (Id. ¶ 25).

UHS Delaware does not debate United Health Services' early use of the phrase "UHS." (See Doc. 163-1). UHS Delaware contends only that United Health Services deliberately abandoned its association with the "UHS" mark in 1997 when it adopted the "UnitedHealth Services" logo system wide. (See Doc. 163-2 at 8-18). UHS Delaware maintains that defendants adopted the new logo with deliberate intent to abandon prior marks. (Id.) United Health Services' junior user defense thus rises or falls on a discrete inquiry: whether United Health Services continuously used the mark since 1982 or effectively abandoned the mark following the system's rebranding initiative in June of 1997.

The Lanham Act provides that a mark is deemed abandoned when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. Intent to abandon may be inferred from circumstantial evidence. Id. The statute requires proof both of "acts indicating practical abandonment" as well as "an actual intent to abandon." Marshak, 240 F.3d at 198 (quoting Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31 (1900)). Hence, to prove abandonment, a party must establish two elements: discontinued use of the mark and intent to abandon by the common law owner. Id.

"Use" in this context means "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark." 15 U.S.C. § 1127. The Third Circuit construes "continued use" to mean "continuous

use of the mark in connection with . . . commercial exploitation." Id. at 199; Warren Publ'g Co. v. Spurlock, 645 F. Supp. 2d 402, 440 (E.D. Pa. 2009). The "residual" or "nominal" use of a mark will not suffice to avoid abandonment. Warren Publ'g Co., 645 F. Supp. 2d at 440 (quoting Kusek v. Family Circle, Inc., 894 F. Supp. 522, 533 (D. Mass. 1995)). The cited use must be "deliberate" rather than "sporadic, casual, or transitory." Goldfaden v. Miss World (Jersey) Ltd., No. 02-712, 2005 WL 1703207, at *7 (D.N.J. July 20, 2005) (quoting La Societe Anonyme des Parfums Le Galon v. Jean Patou, Inc., 495 F.2d 1265, 1271-72 (2d Cir. 1974)); Kusek, 894 F. Supp. at 533 (same).

Following its rebranding initiative in 1997, United Health Services took no action to continue commercial exploitation of the "UHS" mark. What is more, the new corporate identity policy prohibited any "variation" from the replacement logo. (Doc. 157, Ex. 47 at 4). Such unequivocal name changes may constitute mark abandonment. See 3 MCCARTHY, *supra* at § 17:11. Boyd seeks to temper the policy statement by suggesting that it means no variation to the *form* of the new mark rather than no variation from use. (See Boyd 30(b)(6) Dep. 63:7-25). This testimony is contradicted by Boyd's subsequent characterization of all residual uses of "UHS" as "rogue" advertising. (See id. 86:4-23).

Nor does a vestigial reference to "UHS Health Care System" on the entrance signs at the Wilson and Binghamton hospitals constitute sufficient "continuing use" within the Lanham Act. No United Health Services representative testified that the signs were maintained in an attempt to commercially exploit the mark; a jury could just as easily conclude that the "monument" references remained because of

31

budgetary constraints, apathy, or lack of consequential oversight. Both of these signs constitute "residual" employ of a mark which does not foreclose an abandonment finding. See Warren Publ'g Co., 645 F. Supp. 2d at 440 (quoting Kusek, 894 F. Supp. at 533).

United Health Services' reliance on its website URL—which contains the "UHS" acronym—is similarly unavailing. The summary judgment record is devoid of documentary evidence or testimony demonstrating an intent to establish United Health Services' URL as a trademark. As *McCarthy* observes, a domain name may "become a trademark *only if it is used as a trademark*." 5 MCCARTHY, *supra* at § 25A:18 (emphasis added). Absent proof that defendants intended the domain name itself to identify the source of services and not merely defendants' location on the internet, the domain name alone does not constitute "use" of a mark. See id.; see also Lockheed Martin Corp. v. Network Solutions, Inc., 985 F. Supp. 949, 956 (C.D. Cal. 1997).

Isolated newspaper references to "UHS" also fail to establish continued use. United Health Services identifies 14 news reports referring to "UHS" between April 2005 and December 2009. (Doc. 153-4, Ex. 2). Most of the articles include "UHS" in headlines and refer first to "United Health Services" or "United Health Services Hospitals" in text before adopting the shorthand acronym throughout. (See id. at 20, 22, 23, 24, 25, 27, 32). United Health Services argues that this third-party usage inures to its benefit for purposes of preserving a mark otherwise deserted by its corporate marketing policy. (See Doc. 168 at 5 n.3).

The court rejects defendants' intimation that third-party use of an abandoned mark should preserve the owner's rights therein.  The cases identified for this proposition found independent commercial use of the mark by the owner *in addition to* significant third party usage within the relevant industry.  See Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc., 937 F.2d 1572, 1577-78 (Fed. Cir. 1991); Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc., No. 01-2950, 2005 WL 2148925, at *7 (S.D.N.Y. Sept. 6, 2005).  United Health Services identifies no authority suggesting that unsolicited third-party references will eternize an owner's rights in an intentionally-abandoned mark.  To hold that such references constitute sufficient owner "use" to forestall abandonment would negate the requirement of deliberate commercial exploitation.  See Marshak, 240 F.3d at 199; Warren Publ'g Co., 645 F. Supp. 2d at 440; Goldfaden, 2005 WL 1703207, at *7.

UHS Delaware presents ample countervailing evidence to establish genuine disputes on this issue.  UHS Delaware's *probata* demonstrates that, following the 1997 rebranding initiative, the new "UnitedHealth Services" mark comprehensively ousted "UHS" as defendants' master brand.  From 1997 through 2010, defendants' website displayed the "UnitedHealth Services" mark.  (Boyd 30(b)(6) Dep. 96:12-15).  Defendants used their new mark on weekly employee newsletters, in a *Stay Healthy* periodical, on annual reports, and in advertisements during that time period.  (Id. 70:15-76:19, 79:5-82:18, 99:4-102:23, 108:22-110:7).  When United Health Services' CEO introduced the rebranding initiative in 2010, he observed that "UHS" is a "*new* name" designed to allow the public to think of "one set of initials rather than as a three-word description."  (Doc. 157, Ex. 61 at 2 (emphasis added)).  This

evidence squarely demonstrates that both defendants and the public previously perceived the "UnitedHealth Services" logo as the system's exclusive brand.  (Id.)

Construing the Rule 56 record in favor of UHS Delaware, the court is compelled to deny United Health Services' motion on junior user grounds.  A reasonable juror could find, based on the record *in toto*, that United Health Services deliberately abandoned the "UHS" mark in favor of the "UnitedHealth Services" master brand.  It is for the jury and not the court to resolve this abandonment quandary.

**D.    United Health Services' Motion: Unfair Competition and the Impact of <u>Lexmark</u>**

United Health Services also seeks summary judgment as to UHS Delaware's unfair competition claims under § 1125(a) of the Lanham Act.  This statutory section "creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."  <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. __, 134 S. Ct. 1377, 1384 (2014).  UHS Delaware asserts only the former claim herein.

In <u>Lexmark</u>, the Supreme Court explored the scope of the statutory remedy available under § 1125(a)(1) and recalibrated the class of plaintiffs authorized by Congress to sue thereunder.  <u>Lexmark Int'l, Inc.</u>, 134 S. Ct. at 1387.  The Court held that the breadth *ex facie* of § 1125(a) is tempered by two judicial considerations: the statutory zone of interests and proximate cause.  <u>See</u> id. at 1388.  To fall within the Lanham Act's zone of interests, the plaintiff must prove "an injury to a commercial interest in reputation or sales."  <u>Id.</u> at 1390.  To demonstrate proximate cause, the

plaintiff must establish "economic or reputational injury flowing directly from the deception wrought" by the defendant. Id. at 1391.  The Court summarized its test as follows: to maintain a cause of action under § 1125(a), "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  Id. at 1395.

Two years ago, this court assumed without strictly deciding that Lexmark would apply with equal force to false advertising and false association claims.  See Advanced Fluid Sys., Inc. v. Huber, 28 F. Supp. 3d 306, 332-33 (M.D. Pa. 2014).  In the interim, three more district courts have also presumed that Lexmark applies broadly to all § 1125(a) claims.  See Martin v. Wendy's Int'l, Inc., No. 15-6998, 2016 WL 1730648, at *4-5 (N.D. Ill. 2016); Lundgren v. Ameristar Credit Sols., Inc., 40 F. Supp. 3d 543, 551 n.4 (W.D. Pa. 2014); Ahmed v. Hosting.com, 28 F. Supp. 3d 82, 90-91 (D. Mass. 2014).  The only court to address the question unequivocally held that Lexmark embraces both types of claims.  See Int'l Found. of Emp. Ben. Plans, Inc. v. Cottrell, No. 14-1269, 2015 WL 127839, at *3 (D. Md. 2015).

We agree with the *ratio decidendi* of the Cottrell court in resolving that Lexmark applies to UHS Delaware's false association claims *sub judice*.  The Court in Lexmark employed broad language in framing its inquiry, speaking to what "a plaintiff suing under § 1125(a) ordinarily must show" and the "right to sue under § 1125(a)," without distinguishing between the statute's constituent causes of action. Lexmark, 134 S. Ct. at 1388-91.  The Court also observed that "[m]ost of the [Act's] enumerated purposes are relevant to false-association cases."  Id. at 1399.  We will not assume that these choices were arbitrary.  The court holds that Lexmark's zone

of interest and probable cause requirements extend to false association claims under 15 U.S.C. § 1125(a)(1)(A).

Lexmark requires an unfair competition plaintiff to "ultimately prove . . . an injury to a commercial interest in sales or business reputation." Lexmark, 134 S. Ct. at 1395.  UHS Delaware submits no evidence substantiating such injury. UHS Delaware purposefully elected not to pursue such evidence, having "agreed to withdraw its claim for recovery of actual damages" and otherwise noting that "[d]amage to [its] business, trade, reputation, and goodwill, as well as diverted sales . . . are not calculable without undue burden and expense."  (Doc. 153 ¶¶ 31-32). This deficit of proof necessarily precludes any assessment of proximate cause.

Rule 56 tasks a non-moving party to respond with proof in support of its claims.  UHS Delaware fails to do so.  As such, the summary judgment record is devoid of any evidence of lost or decreased sales, diminished goodwill, or other injury proximately caused by defendants.  See Lundgren, 40 F. Supp. 3d at 551; see also Ahmed, 28 F. Supp. 3d at 91.  The court will grant United Health Services' motion as to the § 1125(a) false association claim.  The court will also grant summary judgment on the state common law unfair competition claims, which are necessarily dependent upon the success of the federal claims.  See R.J. Ants, Inc. v. Marinelli Enters., LLC, 771 F. Supp. 2d 475, 489 (E.D. Pa. 2011).

**IV.**   <u>**Conclusion**</u>

The extant factual disputes *sub judice* are manifold and material.  The court will grant United Health Services' motion as to UHS Delaware's unfair competition claims in Count II and IV.  The court will otherwise deny both parties' Rule 56 motions and set this matter for trial.  An appropriate order shall issue.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     December 29, 2016